THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MONTEL AVANT, Defendant-Appellant.

Fourth District   No. 4—00—0183

Opinion filed June 20, 2001.—Modified on denial of rehearing June 17, 2002.

STEIGMANN, J., dissenting.

Daniel D. Yuhas and John M. McCarthy (argued), both of State Appellate Defender's Office, of Springfield, for appellant.

John C. Piland, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Jeffrey K. Davison (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE MYERSCOUGH delivered the opinion of the court:

In December 1999, the trial court convicted defendant, Montel Avant, of possession of a controlled substance with intent to deliver (more than 1 gram but not more than 15 grams of a substance containing cocaine) (720 ILCS 570/401(c)(2) (West 1998)) and later sentenced him to four years in prison.

Defendant appeals, arguing that (1) the trial court erred by denying his motion to suppress evidence because the evidence was obtained during an illegal seizure, and (2) his conviction should be reversed because it was based, in part, on a police laboratory report (hereinafter lab report) admitted into evidence pursuant to section 115—15 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115—15 (West 1998)), which the Supreme Court of Illinois declared unconstitutional in *People v. McClanahan*, 191 Ill. 2d 127, 140, 729 N.E.2d 470, 478 (2000). This court rendered an opinion affirming the trial court's judgment. *People v. Avant*, No. 4—00—1083 (June 20, 2001). Defendant filed a petition for rehearing. We now withdraw our opinion filed June 20, 2001, and by this opinion, reverse the trial court's judgment. We reverse.

## I. BACKGROUND

Champaign police officer Mark E. Huckstep was the only witness to testify at the August 1999 hearing on defendant's motion to suppress evidence. Huckstep testified as follows.

In April 1999, he was a member of Champaign's community-policing unit and was assigned to the housing projects and surrounding area, which included North Fourth Street. He worked 9 a.m. to 5 p.m. shifts at that time.

Around 2 p.m. on April 29, 1999, Huckstep was patrolling the 900 block of North Fourth Street with his partner, Mary Bunyard, in an unmarked police car. Both officers were in uniform. Huckstep observed defendant, who was walking south on Fourth Street as Huckstep was driving north. Huckstep described his interest in defendant as follows: "I wasn't familiar with him. I [had] seen him around there the last few days, but I [had] never spoken to him before, so I wanted to get acquainted with him." Huckstep said that defendant "appeared to be hanging around in the 900 block" and did not appear to be intoxicated or under the influence of anything.

Huckstep turned off of Fourth Street onto East Eureka, parked on the side of the road, got out of the car, and approached defendant (who

was still walking southbound on Fourth Street north of Eureka). Bunyard got out of the car and followed Huckstep, but she was "not too close" to him. She was about 10 feet behind Huckstep. Huckstep asked defendant if he could speak to him and defendant said, "yeah." Huckstep asked defendant if he had any identification. Defendant did not have identification on him but provided his personal information verbally to Huckstep. Huckstep then called in a warrant check, using the radio on his shoulder, and learned that defendant had no outstanding warrants. Huckstep then asked defendant if he had anything illegal on his person. Defendant said, "yeah, I have some rocks." Huckstep took that to mean "rock cocaine" and asked defendant to hand the rocks to him. Defendant reached into his left coat pocket, pulled out a bag, and handed it to Huckstep. Huckstep said that the police had received "a lot of complaints about high drug activity going on in that block for quite some time," and he had seen defendant hanging around in that area the few days previous.

The following colloquy occurred:

"Q. [ASSISTANT STATE'S ATTORNEY]: Your stopping of [defendant] was merely to satisfy your desire to ascertain his identity?

A. [HUCKSTEP]: Yes. When I stopped him was what I would consider to be a voluntary contact.

Q. But it was merely to ascertain his identity? It was pursuant to no other investigative function, correct?

A. I was not familiar with his identity, no.

Q. All right. And you weren't investigating any robberies, burglaries, or any other crimes where you might have been seeking the identity of any individual?

A. No.

* * *

Q. So the fact that you'd seen this individual a couple of times before in [sic], in and of itself, is not suspicious, is it?

A. I would say in the block that he'd been hanging in, the way he had been hanging, yeah, it was suspicious.

Q. Well, you keep saying [']hanging.['] Can you describe that as any particular criminal or suspicious activity?

A. That's not criminal, no.

* * *

Q. Do you think that all young men who, as you say, just [']hang['] like [defendant] are under suspicion and should be stopped?

A. I'm not saying all men that hang should be stopped, but as a police officer it's my job to get acquainted with people especially in the community[-]policing role. My job is to get out and deal with the public more."

On re-cross-examination, defense counsel queried further, as follows:

"Q. What was suspicious about [defendant]?

A. The fact that he'd just been—I hadn't seen him prior to that except for the last two or three days and that he just continued to hang in that immediate area which had been a high drug activity area.

Q. Okay. When you say he was [']hanging['], can you describe the distance or the parameters of the area in which you saw him hanging?

A. Within that block maybe as far down as the convenient store, within a two-block range, walking back and forth on the sidewalk.

Q. Over what sort of time period are we talking about him walking from one end to the other?

* * *

A. Two to three days, probably four to five hours, if I recall right, a day."

At the conclusion of the hearing, the trial court denied defendant's motion to suppress the evidence and explained its ruling, in pertinent part:

"Based on the evidence, I find and conclude that [Huckstep's] contact with this defendant was not a seizure, but was rather a contact by [Huckstep], which contact was a part of [Huckstep's] community[-]caretaking function. The duration of the entire transaction was approximately three minutes."

At defendant's December 1999 bench trial, Huckstep testified consistently with his testimony at the hearing on defendant's motion to suppress evidence. In addition, he testified that (1) the 900 block of North Fourth Street is a high drug-trafficking area; (2) he had seen defendant on a couple of days prior to April 29, 1999, "stead[il]y walking back and forth, up and down the sidewalk" spanning two blocks; and (3) defendant handed him a bag containing 26 individual bags of crack cocaine.

Roberta Johnson, an employee in the evidence section of the Champaign police department, testified that she transported the drug evidence to the Illinois State Police Laboratory in Springfield and identified the lab report that was generated as a result. The State moved to admit the lab report into evidence. The defendant did not object, and the trial court admitted the report.

The trial court found defendant guilty of possession of a controlled substance with intent to deliver (more than 1 gram but not more than 15 grams of a substance containing cocaine) (720 ILCS 570/401(c)(2) (West 1998)) and sentenced him as stated. This appeal followed.

## II. ANALYSIS

### A. Defendant's Fourth Amendment Claim

Defendant first argues that the trial court erred by denying his motion to suppress evidence because it was obtained in an illegal seizure in violation of the fourth amendment of the United States Constitution (U.S. Const., amend. IV). Specifically, he contends that (1) the court erred by finding that Huckstep was performing a community-caretaking function during their encounter, and (2) Huckstep did not have the degree of suspicion necessary to justify an investigatory detention under *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). We agree.

### 1. *Standard of Review*

■ When the facts are not in dispute, as in this case, we review *de novo* a trial court's determination on a motion to suppress evidence. *People v. Buss*, 187 Ill. 2d 144, 204-05, 718 N.E.2d 1, 35 (1999).

### 2. *Community-Caretaking Function*

■ "[T]he community[-]caretaking function does not provide an independent exception to the requirements of the fourth amendment. Instead, it is a moniker used to describe consensual encounters between the police and members of the public." *People v. Dale*, 301 Ill. App. 3d 593, 600, 703 N.E.2d 927, 932 (1998). The community-caretaking function has been described as police conduct that is " ' "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." [Citations.]' " *People v. Bailey*, 314 Ill. App. 3d 1059, 1062, 733 N.E.2d 891, 894 (2000). Even when a police officer begins a citizen encounter in his capacity as a community caretaker, the encounter can be characterized as a seizure if the officer's conduct during the encounter exceeds the scope of a community-caretaking encounter. *Bailey*, 314 Ill. App. 3d at 1062-64, 733 N.E.2d at 894-95 (Officers initially detained the defendant inside a residence to prevent him from interfering with the arrest of another; the State's community-caretaking function argument, however, failed because the officers exceeded the lawful scope of the detention when they questioned defendant about his own criminality).

In *People v. Leifker*, 307 Ill. App. 3d 25, 26, 716 N.E.2d 1268, 1269 (1999), an officer initially stopped the defendant, who was walking home on a rural road. The officer asked defendant some questions, wrote down the information, and told the defendant he could go. After running a computer check, the officer learned that defendant had a prior arrest related to drug paraphernalia. He then stopped the defendant a second time, and the encounter led to the discovery of drug

paraphernalia. The reviewing court held that the officer was performing a community-caretaking function during the first stop, but in the second encounter the officer "detained defendant for the purpose of detecting or acquiring evidence related to a possible criminal offense, \*\*\* [without] possess[ing] beforehand the articulable and reasonable suspicion of criminal activity necessary for a lawful *Terry* stop." *Leifker*, 307 Ill. App. 3d at 29, 716 N.E.2d at 1271.

Here, even though Huckstep testified that the location and the "way [defendant] had been hanging, \*\*\* it was suspicious," Huckstep also admitted that he stopped defendant to satisfy his desire to ascertain defendant's identity. He testified that he considered the stop to be a "voluntary contact," and that, "as a police officer it's my job to get acquainted with people especially in the community[-]policing role. My job is to get out and deal with the public more." Huckstep further testified that he had seen defendant in the "last few days, but [had] never spoken to him before, so I wanted to get acquainted with him." Huckstep's testimony was essentially that he was performing his community-caretaking function.

■ We find that Huckstep's encounter may have begun as a community-caretaking encounter; however, as in *Leifker*, we find the encounter exceeded the scope of a community-caretaking encounter and escalated into a seizure. Huckstep may have merely sought an introduction when he approached defendant and asked him his name. However, Huckstep's further questioning of defendant, after running a check for outstanding warrants on him, turned the encounter investigatory in nature thereby resulting in an investigative detention. Therefore, we find that the trial court erred in finding that Huckstep's contact with defendant was part of Huckstep's community-caretaking function.

This determination, however, does not end our analysis. We next must determine whether the circumstances here were sufficient to warrant an investigative *Terry* stop initially or sufficient after the initial inquiry. *People v. Carlson*, 307 Ill. App. 3d 77, 81, 716 N.E.2d 1249, 1252 (1999) (the officer was acting in his community-caretaker capacity when he tapped on the window of a parked car on the side of the road, awakening the driver; however, the odor of alcohol and the appearance of the driver gave rise to articulable suspicion that the driver had violated the law); *People v. Ciesler*, 304 Ill. App. 3d 465, 471, 710 N.E.2d 1270, 1275 (1999) (the officer was performing a community-caretaking role when she initially approached the cab of the truck to inquire whether the driver needed assistance; once she detected indicia of the driver's intoxication, she had articulable suspicion of criminal activity to justify further detention).

## 2. *Investigative Terry Stop*

■ The protection afforded under the fourth amendment balances the public interest in controlling crime and effective law enforcement with an individual's right to be free from unreasonable search and seizure. *United States v. Mendenhall*, 446 U.S. 544, 565, 64 L. Ed. 2d 497, 517, 100 S. Ct. 1870, 1883 (1980). Thus, a police officer may conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot without violating the fourth amendment. *Illinois v. Wardlow*, 528 U.S. 119, 123, 145 L. Ed. 2d 570, 576, 120 S. Ct. 673, 675 (2000).

> "Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18, 66 L. Ed. 2d 621, 628-29, 101 S. Ct. 690, 695 (1981).

This totality-of-the-circumstances analysis involves various objective observations, and "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior" (*Wardlow*, 528 U.S. at 125, 145 L. Ed. 2d at 577, 120 S. Ct. at 676).

■ Since the Supreme Court decided *Terry*, it has "relaxed the standard announced therein and afforded officers greater latitude, particularly in drug cases, in an effort to provide them greater protection." *People v. Rivera*, 272 Ill. App. 3d 502, 507, 650 N.E.2d 1084, 1088 (1995). The Supreme Court in *Wardlow* recently considered whether a *Terry* stop was justified, and in doing so, examined whether, and to what degree, an individual's flight from police in a high-crime area gave rise to a reasonable suspicion of criminal activity. *Wardlow*, 528 U.S. at 124-25, 145 L. Ed. 2d at 576-77, 120 S. Ct. at 676-77. In deciding *Wardlow*, the Court spoke directly to two issues raised by the facts of the present case—namely, to what degree a reasonable suspicion can be based on (1) the neighborhood where the suspicious conduct occurred, and (2) the arguably innocent nature of the conduct itself. *Wardlow*, 528 U.S. at 124-26, 145 L. Ed. 2d at 576-77, 120 S. Ct. at 676-77. Regarding the issue of to what degree a reasonable suspicion can be based on the neighborhood where the suspicious conduct occurred, the Court wrote as follows:

"An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. [Citation.] But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a 'high[-]crime area' among the relevant contextual considerations in a *Terry* analysis." *Wardlow*, 528 U.S. at 124, 145 L. Ed. 2d at 576, 120 S. Ct. at 676.

Regarding the second issue of to what degree a reasonable suspicion can be based on the arguably innocent nature of the conduct itself, the Court opined as follows:

"Respondent *** also argue[s] that there are innocent reasons for flight from police and that, therefore, flight is not necessarily indicative of ongoing criminal activity. This fact is undoubtedly true, but does not establish a violation of the [f]ourth [a]mendment. Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation. The officer observed two individuals pacing back and forth in front of a store, peering into the window[,] and periodically conferring. [Citation.] All of this conduct was by itself lawful, but it also suggested that the individuals were casing the store for a planned robbery. *Terry* recognized that the officers could detain the individuals to resolve the ambiguity. [Citation.]

In allowing such detentions, *Terry* accepts the risk that officers may stop innocent people. Indeed, the [f]ourth [a]mendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent. The *Terry* stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way." *Wardlow*, 528 U.S. at 125-26, 145 L. Ed. 2d at 577, 120 S. Ct. at 677.

■ A *Terry* stop still requires that the officer be able to point to specific and articulable facts which raise a reasonable suspicion that the person stopped has committed or is about to commit a crime. *People v. Smithers*, 83 Ill. 2d 430, 434, 415 N.E.2d 327, 330 (1980); *People v. Sparks*, 315 Ill. App. 3d 786, 792, 734 N.E.2d 216, 221 (2000). The Supreme Court of Illinois recently defined the reasonableness standard for police conduct in the context of a *Terry* stop:

" 'Viewed as a whole, the situation confronting the police officer must be so far from the ordinary that any competent officer would

be expected to act quickly. The facts supporting the officer's suspicions need not meet probable cause requirements, but they must justify more than a mere hunch. The facts should not be viewed with analytical hindsight, but instead should be considered from the perspective of a reasonable officer at the time that the situation confronted him or her.' " *People v. Love*, 199 Ill. 2d 269, 276 (2002), quoting *People v. Thomas*, 198 Ill. 2d 103, 110, 759 N.E.2d 899, 903 (2001).

When viewed as a whole, the situation confronting Huckstep was not so far from the ordinary that Huckstep would be expected to act quickly. We conclude, therefore, that there was no basis for a *Terry* stop.

The articulable reasons Huckstep pointed to in support of his stopping defendant were as follows: (1) he had observed defendant's behavior for two to three days, (2) he had observed defendant pacing the same two-block area for four to five hours each day, and (3) he knew the area to be a high drug-trafficking area. Huckstep also testified that the *way* the defendant "had been [']hanging[']" *and* the location *were suspicious*. Huckstep, however, did not testify that he was suspicious of defendant. Rather, he testified that he had "seen him around there the last few days, *** never spoke to him before, so I wanted to get acquainted with him." Huckstep testified that it was his job to get acquainted with people "especially in the community[-] policing role." Based upon the totality of the circumstances—the whole picture—in the present case, we find that Huckstep's particularized and objective bases for stopping defendant were insufficient to justify a *Terry* stop. See *People v. Harper*, 237 Ill. App. 3d 202, 205-06, 603 N.E.2d 115, 117 (1992) ("The facts known to the officers simply did not establish an articulable basis to believe that a crime had been, or was about to be, committed. The officers merely observed defendant leave a car parked near the subject premises, enter the building, remain for a short time, and leave. The officers did not observe any transactions within the building or hear any conversations. They did not know what defendant did while inside the building. They had not received a report of any crime or suspicious activity in the vicinity. Their decision to stop defendant was based on no more than a hunch that he might be involved in drug activity"); *cf. Love*, 199 Ill. 2d at 277 (Officer "had more than a mere hunch; he had first-hand knowledge of sufficient facts to create a reasonable suspicion that the defendant was selling drugs" when he observed what appeared to be a drug transaction. During a 10-minute surveillance, through binoculars, the officer observed defendant in front of an apartment building in a residential area. He saw a man approach a person on a bicycle and give

that person some money. The person on the bicycle then directed the man toward the defendant. The officer observed defendant remove an item from her mouth and hand it to that individual). In the present case, unlike *Love*, Huckstep did not observe anything except defendant walking the same two-block area. Specifically, Huckstep observed defendant walking for approximately four to five hours a day over the course of two to three days. No evidence suggested that Huckstep observed defendant doing anything but walking during this period of time or that Huckstep observed anyone approach defendant or that defendant was involved in any transaction. Rather, Huckstep stated that he was not familiar with defendant. He had seen him in the area "the last few days, but I [had] never spoken to him before, so I wanted to get acquainted with him." Huckstep further stated that "it was [my] job to get acquainted with people especially in the community[-] policing role. My job is to get out and deal with the public more." Like *Harper*, we conclude that the facts known to Huckstep simply did not establish an articulable basis to believe that a crime had been, or was about to be, committed.

Moreover, nothing in the record indicates that anything occurred as a result of Huckstep's initial inquiry with defendant that gave rise to a reasonable suspicion that defendant was or had been involved in criminal activity. Accordingly, we hold that the trial court erred by denying defendant's motion to suppress. Because we have concluded that the court should have suppressed the only evidence of defendant's guilt, we reverse defendant's conviction and need not remand for further proceedings. *People v. Fondia*, 317 Ill. App. 3d 966, 972-73, 740 N.E.2d 839, 844 (2000).

## B. *McClanahan*

Last, defendant argues that this court should reverse his conviction because the only evidence that he possessed drugs was admitted under section 115—15 of the Code (725 ILCS 5/115—15 (West 1998)), which the Supreme Court of Illinois declared unconstitutional in *McClanahan*, 191 Ill. 2d at 140, 729 N.E.2d at 478. In light of our resolution of this case, we need not consider defendant's other claim of error.

## III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment.

Reversed.

COOK, J., concurs.

JUSTICE STEIGMANN, dissenting:

Although I agree with much of the majority's analysis, I disagree with the result it reaches. In my judgment, what occurred in this case was a *Terry* stop that the circumstances fully justified.

Clearly, an innocent person might simply walk back and forth along a two-block span for two or three days, four to five hours per day, as defendant did here. However, in making a determination of reasonable suspicion, the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to the noncriminal act in light of existing circumstances, including an officer's knowledge of the neighborhood where the conduct occurred and particular patterns of criminal behavior. See *United States v. Sokolow*, 490 U.S. 1, 10, 104 L. Ed. 2d 1, 12, 109 S. Ct. 1581, 1587 (1989). In this case, (1) Huckstep had observed defendant's behavior for two to three days; (2) he observed defendant pacing the same two-block area for four to five hours each day; and (3) Huckstep knew the area to be a high drug-trafficking area. Viewing Huckstep's observations in light of his knowledge of the neighborhood and the modes of behavior of drug dealers, an inference is clearly reasonable that defendant had committed, was committing, or was about to commit a crime—specifically, trafficking in unlawful drugs. Accordingly, this court should hold that the trial court did not err by denying defendant's motion to suppress.

The majority seems to place great weight not only on Huckstep's observations of the situation he confronted, but also his *conclusions* concerning it. However, Huckstep's testimony regarding his suspicions and intent seemed to change depending upon who was questioning him. For instance, he agreed with the prosecutor that he stopped defendant merely to ascertain his identity, not for some other investigative function. Yet, later on re-cross-examination, he testified about those aspects of defendant's conduct that struck him as suspicious.

The majority is correct that this case requires us to determine whether the circumstances here (1) were sufficient to warrant an investigative *Terry* stop initially or (2) became sufficient after Huckstep's initial inquiry. 331 Ill. App. 3d at 150. The majority is also correct that a police officer may conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot without violating the fourth amendment. 331 Ill. App. 3d at 151. However, an analysis of these factors requires a focus on the nature of the circumstances confronting Huckstep, *not* on what conclusions Huckstep drew from those circumstances. Despite the seeming inconsistencies in Huckstep's testimony concerning *why* he did what he did, there was no inconsistency or uncertainty about *what* he saw,

and, in my judgment, what he saw was sufficient to justify a *Terry* stop.

The need to focus a court's analysis on the factual circumstances rather than the subjective conclusions drawn by police officers has been discussed in search and seizure cases addressing whether probable cause to arrest existed in those cases. For instance, in *Buss*, 187 Ill. 2d at 203, 718 N.E.2d at 34, the supreme court reviewed a trial court's denial of the defendant's motion to suppress evidence that the police seized from him after searching his car allegedly with his consent. The defendant argued on appeal that his consent was the product of an illegal arrest and, therefore, involuntary. The supreme court affirmed the denial of defendant's motion to suppress and wrote the following:

> "We begin by addressing the legality of defendant's arrest. The circuit court found that defendant was not arrested until 12:30 p.m. on August 10, at which time the police had probable cause to arrest him. We may affirm the circuit court's ruling on defendant's motion to suppress for any reason in the record, regardless of whether the circuit court expressed this reason as a basis for its conclusion. [Citation.] While we agree that the police had probable cause to arrest defendant, we find that probable cause existed before 12:30 p.m. on August 10. Our review of the record convinces us that police had probable cause to arrest defendant when they met with him at the Wilmington Dam at approximately 9 a.m. on August 10." *Buss*, 187 Ill. 2d at 205, 718 N.E.2d at 35.

Interestingly, the two police officers (Sims and Mitchell) primarily involved in the murder investigation of the defendant in *Buss* did not believe they possessed sufficient evidence to arrest him at the Wilmington Dam at approximately 9 a.m. *Buss*, 187 Ill. 2d at 209, 718 N.E.2d at 37. However, the officers' legal conclusions did not trouble the supreme court:

> "We also reject defendant's suggestion that the State did not establish probable cause to arrest him because Sims and Mitchell testified that they believed they did not have sufficient evidence to arrest defendant at the Wilmington Dam. Probable cause is an objective standard, and an officer's subjective belief as to the existence of probable cause is not determinative. [Citation.] As we have explained, the facts demonstrate that police had probable cause to arrest defendant at the Wilmington Dam, and their subjective beliefs to the contrary do not alter that conclusion." *Buss*, 187 Ill. 2d at 209, 718 N.E.2d at 37.

The supreme court reaffirmed this point in *People v. Chapman*, 194 Ill. 2d 186, 218-19, 743 N.E.2d 48, 68-69 (2000), where the court wrote the following:

"As a final matter, we reject defendant's suggestion that the State did not establish probable cause to arrest him because a police officer testified at the hearing that the police would not have been able to obtain an arrest warrant before going to defendant's apartment. 'Probable cause is an objective standard, and an officer's subjective belief as to the existence of probable cause is not determinative.' *Buss*, 187 Ill. 2d at 209[, 718 N.E.2d at 37] (rejecting the defendant's argument that the determination of probable cause was affected by police officers' testimony that they did not believe that they had probable cause to arrest the defendant). As we have discussed, the facts demonstrate that the police had probable cause to arrest defendant, and a subjective belief to the contrary does not change that conclusion."

Just as probable cause is an objective standard, so is the standard governing when a reasonable, articulable suspicion exists to warrant a *Terry* stop. See *People v. Chavez*, 327 Ill. App. 3d 18, 31-32, 762 N.E.2d 553, 566 (2001) (An objective standard is used in determining whether the facts and circumstances known to the officer at the time of the stop would warrant a person of reasonable caution to believe a *Terry* stop was necessary). Indeed, it could hardly be otherwise, given that the existence of probable cause to arrest authorizes much more intrusive police conduct, including a full custodial arrest, as well as a thorough search incident to arrest.

Huckstep's uncontradicted testimony regarding his observations of defendant's conduct provided more than enough evidence, when judged by an objective standard, to warrant Huckstep's making a *Terry* stop of defendant. That Huckstep (and the trial court) may not have thought so does not matter, and the majority errs by placing weight on Huckstep's legal conclusions. The majority's doing so violates the supreme court's holdings on point in both *Buss* and *Chapman*.

For the reasons stated, I respectfully dissent.