THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JOHNNIE C. MILES, Defendant-Appellee.

Fourth District    No. 4—02—0624

Opinion filed October 29, 2003.

Frank Young, State's Attorney, of Danville (Norbert J. Goetten, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Charles M. Schiedel and Duane E. Schuster, both of State Appellate Defender's Office, of Springfield, for appellee.

JUSTICE APPLETON delivered the opinion of the court:

Defendant, Johnnie C. Miles, moved to suppress the State's evidence against him because the police had acquired it by violating the fourth amendment (U.S. Const., amend. IV). After an evidentiary hearing, the trial court granted the motion. The State appeals, arguing that by requesting identification from defendant, a passenger in a car legally stopped for a traffic violation, the police did not violate the fourth amendment.

The trial court found the police had no probable cause or articulable suspicion that defendant had committed any crime. We accept that pivotal finding because it is not against the manifest weight of the evidence. Efforts to identify defendant extended an otherwise routine traffic stop to as long as half an hour. We hold that the police impermissibly prolonged the stop and increased its confrontational nature, thereby violating the fourth amendment. Therefore, we affirm the trial court's judgment.

## I. BACKGROUND

The information charged that defendant committed the offense of obstructing justice (720 ILCS 5/31—4(a) (West 2002)) in that with the intent to prevent his apprehension, he lied to a police officer, Troy Wasson, about his identity.

Two witnesses testified at the suppression hearing on July 31, 2002, Wasson and another Danville police officer, Amy Burns.

Burns testified she was patrolling Danville in her squad car on January 16, 2002, at 11:20 p.m., when she pulled over a car driven by Trudy Lott. Defense counsel asked Burns:

"Q. Why did you stop the vehicle?

A. The rear registration light was not functioning."

The car had two occupants, Lott and a passenger, and they started to get out. As Burns approached, she ordered them back into the car. It was dark outside, and Burns did not recall if the inside of the car was illuminated.

Burns spoke with Lott first, asking for her driver's license and proof of insurance. Then she asked defendant, the passenger, for identification. He replied he did not have any identification "on him," whereupon she asked him for his name and date of birth. According to Burns, the stop had lasted, at that point, "[m]aybe not even a minute." Defendant told her his name was David Miles and his date of birth was December 10, 1972. Defense counsel asked Burns:

"Q. Why did you ask the passenger to identify himself?

A. He didn't have a seatbelt on."

According to Burns, Wasson arrived "almost immediately" to back her up. By conferring with headquarters over the radio, Wasson learned that a man named Johnnie C. Miles, with a physical description resembling that of defendant, was wanted on a warrant in Fountain County, Indiana. The prosecutor asked Burns:

"Q. *** From the time you stopped the car until the defendant is actually identified as Johnnie Miles, how long would you say that took?

A. I don't recall. It's been a long time. Maybe five minutes.

Q. Okay. Could it have been as long as half an hour?

A. Could have. I don't know. It took a while for us to get the information from Investigator Hogren and to match him up, and then we requested his [s]ocial [s]ecurity number[.] [A]ll that had to happen."

Wasson testified he heard on the radio that Burns had stopped a vehicle and he went to assist her. When he arrived, Burns was speaking with Lott, the driver. Burns asked Wasson to help identify defendant, the passenger, because she "had [run] [the] information [she had obtained from him] and he had come back [as] ['no record on file.[']" "[A]t that point she was occupied with the driver[,] [and] I went ahead and took over questioning Mr. Miles as far as his identification was." Wasson asked him for his date of birth and social security number. "I ran that [information] *** a different way through [Danville Police] Communications, [and] it still came back [as] ['no record on file,['] and at that point I was contacted over the [handheld] radio by Detective Troy Hogren."

Wasson learned from Hogren that Fountain County had issued an arrest warrant for a Johnnie C. Miles. Hogren gave Wasson the details of the warrant via radio. The physical description in the warrant seemed to match that of defendant. The warrant also stated a social security number, which differed from the one defendant had given by only the two middle digits. Wasson told defendant to get out of the car because he was under arrest. Defendant got out, fled on foot, and the police chased and arrested him.

Wasson estimated that from the moment he arrived until the moment he told defendant to get out of the car, "at the very most 20 minutes" elapsed. "And during the entire time[,] we were continually checking information that he was providing[;] it was an ongoing investigation."

Defense counsel asked Wasson:

"Q. Did you know why Officer Burns stopped the vehicle?

A. She told me that he wasn't wearing his seatbelt. He was cited for that later."

In his closing argument, defense counsel conceded that the "light over the license plate" was "out" and the police therefore had "probable cause to talk to the driver and ask for information." He contended, however, that the police lacked probable cause to question defendant. Just because defendant had no seat belt on when Burns was questioning him, it did not follow he had no seat belt on at the time of the stop; for, as Burns had testified, Lott and defendant had started to exit the car, and to do so, they obviously would have had to unbuckle their seat belts. Defense counsel cited *People v. Gonzalez*, 324 Ill. App. 3d 15, 753 N.E.2d 1209 (2001), *rev'd on other grounds*, 204 Ill. 2d 220, 789 N.E.2d 260 (2003), for the proposition that a traffic offense by the driver gives the police no probable cause to request identification from a passenger.

The prosecutor argued "the stop obviously [was] valid" and Burns had "probable cause [to ask defendant for identification] based upon her sighting and observing [his failure] to wear a seatbelt." He argued the Second District's decision in *Gonzalez*, though not yet reversed, was unsound. According to him, the police "took it one step at a time" and "eventually" discovered defendant's true identity "after a fairly short period of time."

After hearing these arguments, the trial court reasoned as follows:

"Here's the problem as I see it. The question to *** Burns was why she asked the passenger for identification. Her response was he didn't have a seatbelt on. No follow-up question on cross or on redirect to indicate at what point he didn't have a seatbelt on. The testimony is they both [exited] the vehicle and then are told to get

back in. Officer Wasson is then asked on cross-examination about his conversation with Officer Burns as to why she stopped the vehicle[,] and he indicated that she said that she stopped the vehicle because he wasn't wearing a seatbelt ***. *** Now, I thought back then, [N]o, wait a minute. I thought the reason for the stop was the light['s] being out. Either way[,] there's no testimony that Mr. Miles is not wearing a seatbelt during the time that the vehicle is being driven. He may not be wearing a seatbelt when he's told to get back into the vehicle[;] that's not a basis for asking him [for] his identification."

The trial court also noted: "I have to look at whatever circumstances under which she can tell me that a passenger in a car at 11:20 p.m. doesn't have [a] seatbelt on ***."

Quoting the appellate court's holding in *Gonzalez*, 324 Ill. App. 3d at 20, 753 N.E.2d at 1214, that "generally, a police officer may not ask for and run a warrant check on the identification of a passenger[ ] without reasonably suspecting the passenger of criminal activity," the trial court granted defendant's motion to suppress.

This appeal followed.

## II. ANALYSIS

■ To the extent a trial court must make findings of fact or assess witnesses' credibility when ruling on a motion to suppress, we will not disturb the ruling unless it is against the manifest weight of the evidence. *Gonzalez*, 204 Ill. 2d at 223, 789 N.E.2d at 263. "Against the manifest weight of the evidence" means "all reasonable and unbiased persons would agree that the opposite conclusion is clearly evident." *National City Bank of Michigan/Illinois v. Property Tax Appeal Board*, 331 Ill. App. 3d 1038, 1042, 780 N.E.2d 691, 695 (2002). If the facts are undisputed, we review the ruling *de novo*. *Gonzalez*, 204 Ill. 2d at 223, 789 N.E.2d at 263. In short, we defer to factual findings that a reasonable trier of fact arguably could make from the evidence, but we do not defer to the trial court's application of the law to those factual findings. *People v. Jones*, 337 Ill. App. 3d 546, 551, 786 N.E.2d 243, 247 (2003).

■ Whether Burns saw defendant had no seat belt on when she pulled the car over was a disputed issue of fact. The trial court resolved that issue against the State, and its finding was not against the manifest weight of the evidence. A reasonable trier of fact would not necessarily have to believe that Burns saw defendant had no seat belt on while Lott's car was in motion. Burns testified that defendant "didn't have a seat belt on," but, as the trial court noted, it was unclear whether she meant at the time of the stop or when she reached the driver's side window and looked inside the car. According to Burns,

Lott and defendant started to exit the car as she approached. Naturally, then, their seat belts would have been unbuckled when, after ordering them back into the car, she spoke with them at the driver's side window. Just because they were wearing no seat belts at that time, it does not necessarily follow that they were wearing no seat belts earlier, when she pulled them over. Moreover, it was nighttime, and Burns could not recall whether the interior of Lott's car was illuminated. Without any clarifying testimony, one might wonder how Burns could have seen, from the vantage of her squad car, that defendant was wearing no seat belt.

In *Gonzalez*, 204 Ill. 2d at 222, 789 N.E.2d at 262, a police officer asked a passenger for identification during a valid traffic stop, even though he had no reason to suspect the passenger of any wrongdoing. The passenger gave him a traffic ticket in lieu of other identification. *Gonzalez*, 204 Ill. 2d at 222, 789 N.E.2d at 262. The officer ran a criminal history of the passenger. *Gonzalez*, 204 Ill. 2d at 222, 789 N.E.2d at 262. "The ensuing encounter *** resulted in a search of defendant's person, revealing a packet of cocaine." *Gonzalez*, 204 Ill. 2d at 222, 789 N.E.2d at 262.

■ The supreme court held that, as a practical matter, the passenger was "stopped by virtue of the stop of the vehicle" and, therefore, was "seized" within the meaning of the fourth amendment. *Gonzalez*, 204 Ill. 2d at 225-26, 789 N.E.2d at 264-65. The reasonableness of the seizure depended on a twofold analysis derived from *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968): (1) " 'whether the officer's action was justified at its inception' " and (2) " 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.' " *Gonzalez*, 204 Ill. 2d at 228, 789 N.E.2d at 266, quoting *Terry*, 392 U.S. at 19-20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879. The stop was justified in its inception because the police officer had witnessed a violation of the traffic law. *Gonzalez*, 204 Ill. 2d at 227-28, 789 N.E.2d at 265-66.

■ In deciding whether the officer's action was "reasonably related in scope," the supreme court used the following analysis:

> "[W]e must consider, as an initial matter, whether the question is related to the initial justification for the stop. If the question is reasonably related to the purpose of the stop, no fourth amendment violation occurs. If the question is not reasonably related to the purpose of the stop, we must consider whether the law enforcement officer had a reasonable, articulable suspicion that would justify the question. If the question is so justified, no fourth amendment violation occurs. In the absence of a reasonable connection to the purpose of the stop or a reasonable, articulable suspicion, we

must consider whether, in light of all the circumstances and common sense, the question impermissibly prolonged the detention or changed the fundamental nature of the stop." *Gonzalez*, 204 Ill. 2d at 235, 789 N.E.2d at 270. Even though "the request for identification was not directly related to the initial justification for the stop and was not otherwise supported by a reasonable, articulable suspicion of criminal activity," the supreme court found no violation of the fourth amendment, only because of the following facts:

"The request for identification was made during the course of the stop while the driver was being questioned by the other officer and did not impermissibly prolong defendant's detention. Further, we cannot say that the question changed the fundamental nature of the stop. A simple request for identification is facially innocuous. It does not suggest official interrogation and is not the type of question or request that would increase the confrontational nature of the encounter. We note, too, that defendant was under no obligation to answer or comply." *Gonzalez*, 204 Ill. 2d at 236, 789 N.E.2d at 270.

The trial court in this case obviously could not have relied on the supreme court's rationale in *Gonzalez* because the supreme court had not yet issued its decision. Nevertheless, we can affirm the trial court's judgment for any reason that the record supports, regardless of whether the trial court relied on that reason. *People v. Everette*, 141 Ill. 2d 147, 158, 565 N.E.2d 1295, 1300 (1990).

■ It is undisputed that the rear registration plate on Lott's vehicle was unilluminated, that this deficiency violated section 12—201(c) of the Illinois Vehicle Code (see 625 ILCS 5/12—201(c) (West 2002)), and Burns therefore had probable cause to stop the vehicle (see *Gonzalez*, 204 Ill. 2d at 227-28, 789 N.E.2d at 265-66). The stop was justified at its inception. See *Gonzalez*, 204 Ill. 2d at 228-29, 789 N.E.2d at 266.

We must next consider whether the police officers' interrogation of defendant " 'was reasonably related in scope to the circumstances which justified the interference in the first place,' " namely, the failure to illuminate the rear registration plate. *Gonzalez*, 204 Ill. 2d at 228, 789 N.E.2d at 266, quoting *Terry*, 392 U.S. at 20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879. The questions Burns and Wasson asked defendant— what is your name, date of birth, and social security number—had nothing to do with Lott's failure to illuminate her rear registration plate. See *Gonzalez*, 204 Ill. 2d at 235-36, 789 N.E.2d at 270.

Burns never said she saw defendant riding in the car with his seatbelt unbuckled, and neither she nor Wasson had any objective reason to suspect him of wrongdoing. Thus, they had no "reasonable,

articulable suspicion that would justify" their questioning of defendant. *Gonzalez*, 204 Ill. 2d at 235, 789 N.E.2d at 270. Even if we assume, despite the lack of any grounds for suspicion, that it was permissible for Burns to run defendant's information through "Danville Police Communications," neither she nor Wasson offered any explanation of why the result of "no record on file" was inherently suspicious. We will not fill that gap by judicial notice. See *People v. Fisher*, 184 Ill. 2d 441, 455, 705 N.E.2d 67, 75 (1998) (courts may take judicial notice only of matters that are commonly known or, if not commonly known, verifiable from sources of indisputable accuracy). A court should not find reasonable grounds for suspicion from the mere fact that the officers' suspicions were aroused. Like probable cause, "reasonable, articulable suspicion" is an objective standard. *People v. Avant*, 331 Ill. App. 3d 144, 157, 771 N.E.2d 420, 431 (2001).

In *Gonzalez*, 204 Ill. 2d at 236, 789 N.E.2d at 270, a police officer made a single request to a passenger for identification "*while* the driver was being questioned by the other officer"; therefore, the request for identification "did not impermissibly prolong" the passenger's detention. (Emphasis added.) By contrast, in the present case, the officers' repeated requests to defendant for identifying data and their efforts to discover his identity substantially prolonged the traffic stop. Burns testified, "It took a while"—as long as half an hour—"for us to get the information from Investigator Hogren and to match him up, and then we requested his [s]ocial [s]ecurity number[.] [A]ll that had to happen." The record does not appear to contain any evidence that issuing Lott a ticket for a missing rear registration light took half an hour—or, if it did, why it took so long. "While we will not impose a rigid time limitation on the duration of a traffic stop, we are concerned with the duration of the traffic stop in the present case." *People v. Cox*, 202 Ill. 2d 462, 469, 782 N.E.2d 275, 280 (2002) (police officer impermissibly extended a routine traffic stop for a missing rear registration light to 15 minutes to make time for the arrival of a drug-sniffing dog).

In *Gonzalez*, 204 Ill. 2d at 236, 789 N.E.2d at 270, the "simple request for identification" was "facially innocuous" and "[did] not suggest official interrogation." It was "not the type of question or request that would increase the confrontational nature of the encounter." *Gonzalez*, 204 Ill. 2d at 236, 789 N.E.2d at 270. Further, as the supreme court noted, the defendant in *Gonzalez* "was under no obligation to answer or comply." *Gonzalez*, 204 Ill. 2d at 236, 789 N.E.2d at 270. Although he might not have known it at the time, defendant was under no obligation to answer the police officers' questions. In *Gonzalez*, however, the supreme court rejected the line of

cases holding that the police can ask a passenger any question provided that the passenger has no obligation to answer. *Gonzalez*, 204 Ill. 2d at 232, 789 N.E.2d at 268. Thus, it is clear from *Gonzalez* that the mere right not to answer does not necessarily save a question from falling afoul of the fourth amendment.

Burns ordered defendant to get back into the car and stay there, and then she asked him for identification. When he stated he had none, she asked him for his name and date of birth. She radioed that information to headquarters, and when the computer check turned up nothing, Wasson took over. He asked defendant again for his name and date of birth, and also for his social security number, so he could run the information through the computer a second time. Under these circumstances, the questioning "suggest[ed] official interrogation" and "increas[ed] the confrontational nature" of what should have been a routine stop for a minor traffic offense. *Gonzalez*, 204 Ill. 2d at 236, 789 N.E.2d at 270. The interrogation of defendant "changed the fundamental nature of the stop" from an investigation of a missing rear registration light into an investigation of a passenger whom the officers had no reason to suspect of any wrongdoing. *Gonzalez*, 204 Ill. 2d at 236, 789 N.E.2d at 270.

■ The police seized defendant when stopping Lott's car for a missing rear registration light. See *Gonzalez*, 204 Ill. 2d at 225-26, 789 N.E.2d at 264-65. Because the duration and manner of the seizure were unreasonable, the officers' actions were not " 'reasonably related in scope to the circumstances which justified the interference in the first place.' " *Gonzalez*, 204 Ill. 2d at 228, 789 N.E.2d at 266, quoting *Terry*, 392 U.S. at 20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879. Therefore, we find a violation of the fourth amendment.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

KNECHT, J., concurs.

JUSTICE TURNER, dissenting:

I respectfully dissent. The officers' conduct did not violate defendant's fourth amendment rights.

Like *Gonzalez*, the officer asked defendant for his identification during a valid, ongoing traffic stop. The simple request for identification was facially innocuous and did not prolong defendant's detention or fundamentally change the nature of the stop. See *Gonzalez*, 204 Ill.

2d at 236, 789 N.E.2d at 270. When defendant responded he did not have any identification on him, the officer requested his name and birth date. That question is also facially innocuous and did not fundamentally change the nature of the stop. Defendant replied with false information, which yielded a "no record on file" result.

Based on defendant having provided false information, the officers continued to question defendant to obtain his true identity. If defendant had provided the correct information, the questioning would not have exceeded the length of the valid traffic stop as in *Cox*. See 343 Ill. App. 3d at 1033. Thus, the extended nature of this stop is attributable to defendant's providing false information, not the officers' conduct.

Additionally, I disagree with the majority's conclusion the officers did not have reasonable, articulable suspicion of criminal activity once the warrant check yielded the "no record on file" result. See 343 Ill. App. 3d at 1033. The "no record on file" indicated defendant had lied about his identity and gave the officers reasonable, articulable suspicion that defendant had obstructed justice.

Regardless of whether the officers violated defendant's fourth amendment rights, the exclusionary rule of the fruit of the poisonous tree doctrine does not extend to suppress defendant's conduct that formed the basis of his obstructing-justice charge.

Under the fruit of the poisonous tree doctrine, the constitutional violation is considered the "poisonous tree" and any evidence that the State obtains by exploiting that constitutional violation is subject to suppression as the "fruit" of that poisonous tree. *People v. McCauley*, 163 Ill. 2d 414, 448, 645 N.E.2d 923, 940 (1994). However, our supreme court has declined to extend the exclusionary rule to suppress evidence of crimes that arise from and are in reaction to an illegal search or seizure. *People v. Abrams*, 48 Ill. 2d 446, 455-57, 271 N.E.2d 37, 43-44 (1971). Thus, the fruit of the poisonous tree doctrine does not require the suppression of evidence of a defendant's own unlawful conduct in response to police conduct that was in violation of the fourth amendment. See *People v. Santana*, 121 Ill. App. 3d 265, 270, 459 N.E.2d 655, 659 (1984).

This case is similar to *Santana*, 121 Ill. App. 3d at 266, 459 N.E.2d at 656, where the defendant sought to quash his arrest and suppress evidence of his actions that formed the basis of his resisting-a-peace-officer (Ill. Rev. Stat. 1981, ch. 38, par. 31—1) and battery (Ill. Rev. Stat. 1981, ch. 38, par. 12—3) charges. There, the defendant spit in a police officer's face and engaged in a scuffle with the same officer after several officers had entered the defendant's apartment even though he had denied them access. *Santana*, 121 Ill. App. 3d at 266-67, 459

1036

N.E.2d at 656-57. The court held that even if the officers' entry was unlawful, the evidence of defendant's conduct that formed the basis of his resisting-a-peace-officer and battery charges should not have been suppressed because the exclusionary rule did not extend to cause suppression of the defendant's unlawful actions that were in response to unlawful police conduct. *Santana*, 121 Ill. App. 3d at 270, 459 N.E.2d at 659; see also *People v. Villarreal*, 152 Ill. 2d 368, 378-79, 604 N.E.2d 923, 928 (1992) (refusing to extend the doctrine to exclude evidence of the defendants' actions directed against the police officers after they entered defendants' home, regardless of the illegality of that entry).

For the reasons stated, I would reverse the trial court's grant of defendant's motion to suppress.