(text box: 1)
 NO. 5-02-0389

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

___________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

Plaintiff-Appellant, )  Madison County.

)

v. )  No. 01-CF-2343

)

WALTER DENT, )  Honorable

)  James Hackett,

Defendant-Appellee. )  Judge, presiding.

___________________________________________________________________________

JUSTICE CHAPMAN delivered the opinion of the court:

Walter Dent, the defendant, was arrested on September 6, 2001, and later charged by information with unlawful possession of cannabis with intent to deliver (720 ILCS 550/5(d) (West 2000)).  The defendant filed a motion to suppress the statements and physical evidence obtained by the police.  After conducting a hearing on the motion, the circuit court found that the defendant had been illegally seized by the police and the court granted the defendant's motion.  The State appealed.  The issue for review is whether the circuit court erred in granting the defendant's motion to suppress.  We affirm.

I. BACKGROUND

The defendant was arrested by police on September 6, 2001, and was charged by way of information the next day with unlawful possession of cannabis with intent to deliver (720 ILCS 550/5(d) (West 2000)).  On September 28, 2001, a preliminary hearing was held.  Sergeant Richard Gillespie of the Alton, Illinois, police department was the only witness to testify at the hearing.

Sergeant Gillespie testified that he participated in the arrest of the defendant.  He said that on September 6, 2001, he and several other officers were assigned a detail that involved going to selected drug locations to perform a "knock-and-talk."  Gillespie testified that they were in undercover vehicles when they observed the defendant get out of his vehicle and walk up to an identified drug house.  Gillespie and the other officers pulled up behind the defendant and approached him from behind.  The defendant was talking on a cell phone at the time and appeared surprised when he turned around to see that there were five or six police officers around him.

Sergeant Gillespie asked the defendant whether he had any dope on him.  The defendant responded in the negative.  Gillespie then said, "Well, you won't mind me checking."  Gillespie testified that the defendant responded that he did not have any drugs and to "go ahead."  Gillespie then patted the defendant down, felt a bulge in the lower part of the defendant's left pant leg, and immediately secured the defendant in handcuffs.  Fourteen small bags of what he believed was cannabis were removed from the defendant's person.  

After the defendant was in custody, Gillespie searched the defendant's vehicle.  He said that the vehicle was unsecured with the keys left in the ignition and that the defendant was actually in physical control of the vehicle at the time of the stop.  He performed an inventory on the vehicle and found two other bags of what he believed to be marijuana.

On cross-examination, Sergeant Gillespie testified that there was a total of nine officers, four police vehicles, and a transport vehicle involved in the "knock-and-talk" detail.  Gillespie said that all nine officers wore their police uniforms, including badges and side arm pistols.  Gillespie testified that the defendant walked to the front door walkway of 912 College Avenue after he exited his vehicle.  When asked about what happened after that, Gillespie testified as follows:

"Q. [Defense counsel:]  How far was he from his car when he was stopped?

A.  Twenty-five, thirty feet.

* * *

Q.  Okay.  At any point did he go back to his vehicle before he was arrested?

A.  Oh, no, sir.

Q.  Now, when *** he was stopped, in what fashion did that happen?  Did your officers surround him?  Did someone tell him to stop?  How did that come about?

A.  Well, he was trying to make it in the front door of the house upon seeing me.  Once I got close enough to him and [
sic
] he turned and acted very surprised.  He attempted–he can't run because he's been shot from an old gunshot wound.  I believe it's his left leg that is a little messed up.

Q.  So what did he do?

A.  He attempted to open the front door, and I said, ['][W]ait a minute, *** do you have any dope on you[?][']

Q.  You told him, as he started to open the front door, to wait a minute?

A.  Right.

***

A.  And I asked him, ['][D]o you have any dope on you[?][']

Q.  At that time where were the other police officers?  Were they in the same area you were in?

A.  Yes, sir.  Some of them were just pulling up and parking and getting out of their vehicle and so forth.

Q.  How many police officers were around [the defendant] at the time you told him to wait up?

A.  Probably just two or three of us.

Q.  And did he comply with your directive and stop–and stop attempting to go into the house at that point?

A.  Yes.

***

Q.  ***  Did he comply with what you had stated to hold up or not go into the house?

A.  Yes, sir.

Q.  And at that point that you made that statement to him, had you observed him commit any criminal act?

A.  No, sir.

Q.  Did you have any information that you had received that he had any drugs on him on this particular day ***[?]

A.  No, sir."

Sergeant Gillespie testified further that he had not observed the defendant engage in any criminal activity before he asked to search the defendant's pockets or clothing.  He did not have a warrant for the defendant's arrest.  Gillespie said that he patted down the defendant within seconds of asking him whether he had drugs in his possession and after he had consented to being searched.  He did not detect anything that felt like a weapon during the pat-down.  

Concerning the search of the defendant's vehicle, Sergeant Gillespie testified that he did not first obtain consent from the defendant, that he did not have a warrant for the search, and that the defendant was in custody at the time of the vehicle search.  Gillespie said that the drugs found in the vehicle were inside the console and that opening the console was necessary to discover their presence. 

At the conclusion of the preliminary hearing, the court found that probable cause existed.  The next day the defendant entered a plea of not guilty and the matter was set for a trial.

On October 10, 2001, the defendant filed a motion to suppress all the statements made by him during the incident, pursuant to section 114-11 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/114-11 (West 2000)), as well as all the physical evidence retrieved from his person and vehicle, pursuant to section 114-12 of the Code (725 ILCS 5/114-12 (West 2000)).  In his motion, the defendant alleged that at the time the uniformed police stopped him, they did not have a warrant to detain him and they had not observed him engaging in conduct that would reasonably lead them to believe that he was about to commit, was then committing, or had committed a crime.  The defendant alleged that Sergeant Gillespie stopped him from entering 912 College Avenue by directing him to "[w]ait a minute" and that he complied with this directive.  The defendant alleged further that he was surrounded by police and in their custody when Gillespie retrieved plastic baggies of suspected marijuana from his pant leg.  The defendant also alleged that the police conducted a warrantless search of his vehicle, which was legally parked approximately 25 feet away from him, resulting in the discovery of two baggies of suspected marijuana inside the vehicle's console.

The defendant argued that the actions of the police violated his federal and state constitutional rights as well as the Code.  He argued that when the police stopped him, they did not have a reasonable inference based upon specific and articulable facts that he had committed or was committing a crime.  He contended further that the retrieval of suspected cannabis from his person without the reasonable belief that it was a weapon or contraband and the frisk of his person were performed by police absent probable cause for an arrest and without a reasonable suspicion that they were in danger of attack.  Lastly, the defendant denied Sergeant Gillespie's claim that he had consented to the search of his person after the stop; the defendant maintained that even if he had given consent, Gillespie's request and questioning of him would have been unlawful because he was in police custody at the time and had not been advised of his rights under 
Miranda v. Arizona
, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

The defendant's motion to suppress was heard on January 29, 2002.  At the hearing, the defendant testified that he drove to a friend's house at 912 College Avenue on September 6, 2001, at approximately 2 p.m.  As he approached the front door of his friend's home, he heard a voice say "Wait a minute."  The defendant turned around and saw that the voice was that of Sergeant Gillespie.  Gillespie then asked him if he had any drugs on him.  The defendant testified that he observed Gillespie and approximately seven to nine police officers coming toward him.  All the officers were uniformed with badges, and all carried side arms.  The defendant, believing that he was in custody, obeyed Gillespie's command and stopped.   The officers came up to where the defendant was standing on the steps leading to the porch of his friend's home.  With the door of his friend's house behind him, the officers surrounded the defendant on three sides.  The defendant informed Sergeant Gillespie that he did not have any drugs in his possession.  The defendant testified that Gillespie then proceeded to begin patting down his pockets and pants.  Sergeant Gillespie asked the defendant if he could search him as he was already patting him down.  The defendant testified that he did not respond.  Gillespie then removed some baggies from the defendant's lower pant leg.  The defendant said that he was then handcuffed and taken to a police car.  Without his consent to do so, the police searched the vehicle.

The State called Sergeant Gillespie as its only witness.  When asked if any other officers accompanied him when he approached the defendant, Gillespie testified that there were a total of four officers in his car but that he was the first one that approached the defendant.  Gillespie said that he was unsure whether any of the other officers were with him at the time he first approached the defendant.  

Gillespie testified that when he approached the defendant, he asked the defendant whether he had any dope or guns in his possession.  The defendant said that he did not.  Gillespie said that he asked the defendant if he minded submitting to a pat-down search and that the defendant said that he did not mind.  Gillespie testified that when he asked the defendant whether he would submit to a pat-down, the defendant was free to leave.

Gillespie denied that he started patting down the defendant before the defendant gave consent to do so.  He further denied that the defendant was surrounded at the time of the pat-down.  Gillespie said that only two other officers were present at the time the pat-down was performed and that the other officers were just getting out of their vehicles.  Gillespie said that only three or four police officers were within five feet of the defendant at the time the pat-down was performed.  He said that until the defendant was handcuffed, neither he nor the other officers blocked the defendant from leaving.

On cross-examination Gillespie was asked to describe a "knock-and-talk."  Gillespie explained that it is an attempt by police to elicit cooperation from residents in order to conduct a drug investigation.  Gillespie explained further that the purpose of the knock-and-talk detail on September 6, 2001, was not to perform arrests or issue warrants of any kind.  He added that he was not authorized by any search warrant that day.  He further expressed his belief that he did not have probable cause to arrest the people inside of the homes he visited.  Gillespie testified that the only knowledge he had of 912 College Avenue before the defendant's arrest was that several anonymous complaints had been received by the drug abuse hotline involving the address and that the residence was leased or rented by someone with the same last name as a family known to be narcotics traffickers in Alton, Illinois. 

Gillespie testified that he and eight of his fellow officers pulled up to the College Avenue address in four unmarked police vehicles and one marked prison transport van, all driving in tandem.  Gillespie said that he did not observe the defendant committing any criminal conduct when he exited his vehicle or when he was on the 912 College Avenue premises.  Gillespie did not have a warrant to search or stop the defendant or to search his vehicle.

Gillespie testified that when the defendant approached the College Avenue residence, he flung the door to the house open.  Gillespie said, "Rather than it coming back and hitting both of us or him, I just grabbed ahold of the door to keep it open."  Gillespie recognized that the defendant was on private property at the time of the incident.  He said that he did not read the defendant his 
Miranda
 rights before asking whether he could search him, because the defendant was not in custody at the time.  

Both the defendant and the State sought to have the transcript of Sergeant Gillespie's testimony from the September 28, 2001, preliminary hearing admitted into evidence as a joint exhibit.  On redirect examination, Gillespie said that the defendant could have entered the house after he asked him to wait a minute but that the people inside the house would not let him in.  He said that he did not block the defendant's ability to enter the house in any way.  Sergeant Gillespie also testified that before he saw the defendant arrive at 912 College Avenue, he was already aware that the defendant had been charged with and convicted for prior marijuana possession in 1997.  He said that other officers had informed him that they knew that the defendant was dealing dope and committing crimes but that they could not catch him.  Gillespie testified, "[The defendant] hangs with all the right people to buy dope and to deal dope ***[;] that's what he's doing."

At the conclusion of the testimony, the court heard argument from the parties and then took the matter under advisement.  On May 22, 2002, the court entered an order granting the defendant's motion to suppress.  The court's order reflected its findings:

"The Court finds that this is not a 
Terry stop
 [(
Terry v. Ohio
, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968))] as the police do not claim to have seen a crime committed or believe that the defendant was committing a crime upon their approach.  The officers approached the defendant under circumstances were [
sic
] a reasonable person would believe rightly that they [
sic
] were detained.  The defendant was approached with an immediate directive from a uniformed police officer to wait or wait a minute.  He was then in the observable presence of seven to nine uniformed police officers and two to three marked vehicles.  The Court finds that he was seized and detained without a lawful basis at that point.  The Court believes that a reasonable person encountering those circumstances would believe that a directive *** from a uniformed police officer approaching in the presence of several other police officers[] would cause that person to reasonably believe that they [
sic
] must abide by that order and are detained."  (Emphasis in original.)

The court found further that any search and seizure resulting from such a stop and detention is barred and that the items seized from the person or property of the defendant were to be suppressed.

The State appealed.

II. ANALYSIS

On appeal, the State contends that the circuit court erred in granting the defendant's motion to suppress.  The State asks that we find that the encounter between Sergeant Gillespie and the defendant was consensual and therefore did not implicate the defendant's fourth amendment rights.  We decline to so hold.  

"Generally, a trial court's decision on a motion to suppress evidence is subject to reversal only if it is clearly or manifestly erroneous."  
People v. Thomas
, 198 Ill. 2d 103, 108, 759 N.E.2d 899, 902 (2001).  In ruling on a motion to suppress evidence, the circuit court must determine the credibility of the witnesses and resolve any conflict in the testimony.  
People v. Koutsakis
, 272 Ill. App. 3d 159, 162, 649 N.E.2d 605, 607 (1995).  Ruling on a motion to suppress evidence involves a mixed question of law and fact in which the trial court must (1) weigh the evidence and determine the facts surrounding the complained-of conduct and then (2) decide whether, as a matter of law, the facts constitute an unconstitutional seizure.  
People v. Cox
, 202 Ill. 2d 462, 465-66, 782 N.E.2d 275, 278 (2002).  A circuit court's determination on a motion to suppress will be accorded great deference.  
Koutsakis
, 272 Ill. App. 3d at 162, 649 N.E.2d at 607.  However, we will review the circuit court's ultimate ruling on a defendant's motion to suppress evidence 
de novo
.  
People v. Gherna
, 203 Ill. 2d 165, 175, 784 N.E.2d 799, 805 (2003).

The fourth amendment to the United States Constitution guarantees people the right to be secure in their persons, houses, papers, and effects from unreasonable searches and seizures.  U.S. Const., amend. IV.  This guarantee applies to all seizures of the person, including those that include only a brief detention short of a traditional arrest.  
Thomas
, 198 Ill. 2d at 108, 759 N.E.2d at 902.  

Not all encounters between citizens and police raise fourth amendment concerns.  Courts have recognized three tiers of police-citizen contact, each with its own constitutional parameters.  The most intrusive of these is an arrest, which requires probable cause to satisfy the fourth amendment's protection against unreasonable searches and seizures.  The next tier is a brief investigative detention or 
Terry
 stop, which requires a reasonable and articulable suspicion of wrongdoing.  
People v. Murray
, 137 Ill. 2d 382, 387, 560 N.E.2d 309, 311 (1990).  The last tier is the least intrusive type of police encounter, commonly called the community-caretaking function or referred to as a public safety function.  
Murray
, 137 Ill. 2d at 387, 560 N.E.2d at 311-12.  Because this last tier involves no coercion or detention, it does not constitute a "seizure" within the meaning of the fourth amendment.  
Murray
, 137 Ill. 2d at 387, 560 N.E.2d at 311. 

Here, the State notes that the police had probable cause to arrest the defendant 
after
 searching him and detecting a bulge in his pant leg.  This, however, does not resolve the question presented by the defendant and decided by the circuit court, 
i.e.
, Was the defendant in custody at the time he was questioned and later searched by the police?

Generally, reasonableness under the fourth amendment requires a warrant supported by probable cause.  
Thomas
, 198 Ill. 2d at 108, 759 N.E.2d at 902.  However, the United States Supreme Court has recognized a limited exception to the probable cause requirement in 
Terry v. Ohio
, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).  In 
Terry
 the Supreme Court held that a law enforcement officer could, under appropriate circumstances, briefly detain an individual for investigatory purposes if the officer reasonably believed that the person had committed or was about to commit a crime.  
Terry
, 392 U.S. at 22, 20 L. Ed. 2d at 906-07, 88 S. Ct. at 1880. 

Terry
 provides a dual inquiry for deciding whether a law enforcement officer's investigatory detention is reasonable: (1) "whether the officer's action was justified at its inception" and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  
Terry
, 392 U.S. at 19-20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879.  Whether the detention of a suspect by police is appropriate is objectively determined after considering the facts available to the officer at the time the situation confronted him or her.  
Thomas
, 198 Ill. 2d at 110, 759 N.E.2d at 903.  The police officer must be able to point to specific and articulable facts that, taken together with rational inferences, reasonably warranted the intrusion.  
Cox
, 202 Ill. 2d at 467, 782 N.E.2d at 278 (citing 
Terry
, 392 U.S. at 20-21, 20 L. Ed. 2d at 905-06, 88 S. Ct. at 1879-80).  Facts supporting an officer's suspicion need not rise to the level of probable cause but must justify more than a mere hunch.  
Cox
, 202 Ill. 2d at 467, 782 N.E.2d at 278 (citing 
Thomas
, 198 Ill. 2d at 110, 759 N.E.2d at 903).  The scope of an investigative detention must be temporary and not last longer than is necessary to effectuate the purpose of the stop.  
Florida v. Royer
, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 238, 103 S. Ct. 1319, 1325 (1983).  "[T]he State bears the burden of showing that a seizure based on reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure."  
People v. Brownlee
, 186 Ill. 2d 501, 519, 713 N.E.2d 556, 565 (1999) (citing 
Royer
, 460 U.S. at 500, 75 L. Ed. 2d at 238, 103 S. Ct. at 1326).  Further, where a law enforcement officer's confinement of an individual goes beyond the permissible limits of a 
Terry
 investigative stop, all the evidence gained as a result of the illegal stop should be excluded as "fruit of the poisonous tree."  See 
Wong Sun v. United States
, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963).

Here, the State agrees with the circuit court's finding that the police encounter with the defendant was not a 
Terry
 stop.  In agreeing with this finding, the State concedes that evidence adduced at both the defendant's preliminary hearing and the suppression hearing established that the police did not have a reasonable belief that the defendant had committed or was about to commit a crime to justify a brief detention of the defendant for investigatory purposes.  We agree with both the findings of the circuit court and the State's position on appeal–the defendant's encounter with the police was not a 
Terry
 stop.

The State contends that the police were performing a community-caretaking function when they encountered the defendant.  The State claims that, with the information that the residence at which the defendant was encountered was rented by a family known to be drug traffickers in the city and based on several complaints made on the drug hotline about the residence, the police went to the residence to perform community caretaking, 
i.e.
, knock-and-talks, and specifically to investigate the reports of criminal activity there.  The State contends that the police may question citizens during criminal investigations and that citizens have a duty to cooperate.  Accordingly, the State believes that the defendant had a duty to assist the police in their investigation of these reports.

The State has misapprehended the meaning of the community-caretaking function of the police.  Performing a knock-and-talk at the residence at which the defendant was found 
for the purpose of investigating reports of criminal activity
 is not police activity that can properly be characterized as community caretaking.  Community caretaking, or the performing of a public safety function, by police "involves no coercion or detention and therefore does not involve a seizure."  
Murray
, 137 Ill. 2d at 387, 560 N.E.2d at 312.  The proper performance of the community-caretaking function involves police activity that is " 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' "  
Murray
, 137 Ill. 2d at 388, 560 N.E.2d at 312 (quoting 
Cady v. Dombrowski
, 413 U.S. 433, 441, 37 L. Ed. 2d 706, 93 S. Ct. 2523, 2528 (1973)).  Police are not performing a community-caretaking function when they are specifically  investigating reports of criminal activity. 

The issue presented by the defendant's motion to suppress was whether he was in custody at the time the police engaged him in questioning.  Said differently, we must decide whether the defendant was improperly seized by the actions of the police at the time he was asked whether he had drugs in his possession.

While a police officer, in most cases, does not violate the fourth amendment guarantee against unreasonable searches and seizures by approaching an individual and questioning him or asking for identification (
Florida v. Royer
, 460 U.S. 491, 497, 75 L. Ed. 2d 229, 236, 103 S. Ct. 1319, 1324 (1983)), this is only the case when " 'the person to whom [the] questions are put remains free to disregard the questions and walk away," because then "there has been no intrusion upon [the] person's liberty or privacy as would under the Constitution require some particularized and objective justification' " (
Murray
, 137 Ill. 2d at 388, 560 N.E.2d at 312 (quoting 
United States v. Mendenhall
, 446 U.S. 544, 553-56, 64 L. Ed. 2d 497, 509-10, 100 S. Ct. 1870, 1877-78 (1980))).  It is not necessary for police officers to physically restrain a person in order to effect a seizure.  All that is needed is a show of authority that would lead a reasonable person to conclude that he or she is not free to leave.  See 
Brownlee
, 186 Ill. 2d at 520, 713 N.E.2d at 565 (citing 
Mendenhall
, 446 U.S. at 553, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877).  This occurs when, in view of all the circumstances, a reasonable person, innocent of any crime, would conclude that he or she was not free to leave.  
Mendenhall
, 446 U.S. at 554, 64 L. Ed. 2d 497, 100 S. Ct. at 1877.  Factors relevant to this determination include (1) the presence of several officers, (2) the display of a weapon, (3) language or tone of voice that indicates that the officer may compel compliance, and (4) physical contact.  
Mendenhall
, 446 U.S. at 554, 64 L. Ed. 2d 497, 100 S. Ct. at 1877.  However, this list of factors is not exhaustive but provides only a few examples of circumstances that may lead to a finding that an individual was seized.  
City of Highland Park v. Lee
, 291 Ill. App. 3d 48, 53-54, 683 N.E.2d 962, 966 (1997).

Here, the State claims that the reason the defendant stopped had nothing to do with his compliance with a police directive, because the defendant did not know who was instructing him to "[w]ait a minute" until after he had stopped and turned around.  Further, the State suggests that the presence of several uniformed police equipped with badges, pistols, mace, and bulletproof vests would not cause an innocent person to reasonably believe that he or she was detained.  We disagree with both contentions.

In determining whether the actions of the police constituted a show of authority that resulted in the defendant's detention, it is not necessary to determine whether the defendant felt that he was in custody at the moment that Sergeant Gillespie instructed him to "[w]ait a minute."  The relevant inquiry is whether, in view of the totality of the circumstances, a reasonable person in the defendant's place could conclude that he was not free to leave at the time the police began questioning him.  

This query was addressed most recently by the Illinois Supreme Court in 
People v. Gherna
, 203 Ill. 2d 165, 784 N.E.2d 799 (2003).  
Gherna
 involved two police officers who approached a vehicle that was parked in a parking lot.  The officers were on bicycle patrol.  They observed a bottle of beer in a cup holder between the seats and noticed that the passenger appeared to be very young.  
Gherna
, 203 Ill. 2d at 168, 784 N.E.2d at 801.  Once the officers ascertained that the bottle of beer was not open and that the passenger was not drinking it, they continued to engage the driver in conversation, which eventually led to a search of the vehicle.  
Gherna
, 203 Ill. 2d at 168-69, 784 N.E.2d at 802.  Similar to the case 
sub judice
, the officers positioned themselves on either side of the truck, next to the doors.  
Gherna
, 203 Ill. 2d at 179, 784 N.E.2d at 808.  In holding that the officers' actions "constituted an official show of authority to which a reasonable innocent person would feel compelled to submit," the court noted that the officers wore uniforms, displayed police badges, and carried weapons, handcuffs, radios, and flashlights.  
Gherna
, 203 Ill. 2d at 180, 784 N.E.2d at 808.  Additionally, the court noted that the officers' positioning beside the truck restrained the occupants' movement by blocking them from exiting the vehicle.  
Gherna
, 203 Ill. 2d at 180, 784 N.E.2d at 808.

We believe that the show of authority exhibited by the police in the instant case was even more pronounced than that involved in 
Gherna
.  Here, Sergeant Gillespie instructed the defendant to wait a minute.  The defendant's hearing of this instruction was immediately followed by his realization that seven to nine uniformed, badge-clad, side arm-carrying police officers were emerging from five vehicles arriving in tandem, the last of which was marked "Alton Police Department."  The officers ultimately surrounded him on three sides.  We believe that this was a sufficient show of authority from which any reasonable person would objectively conclude that his or her freedom of movement was restricted.  A person presented with these circumstances could reasonably conclude that if he or she were to depart, law enforcement "would soon be in hot pursuit."  
Brownlee
, 186 Ill. 2d at 520, 713 N.E.2d at 566.  The fact that the defendant answered the questions put to him by police and may have consented to the search of his person does not transform the nature of the encounter from a detention to a consensual encounter.  We conclude that the defendant was unlawfully detained in violation of the fourth amendment.  All the evidence obtained as a result of the illegal stop should be excluded as "fruit of the poisonous tree," including the seizure of the items discovered by police in their later search of the defendant's vehicle.  See 
Wong Sun v. United States
, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963).

Lastly, the State contends that in its order the court committed error in misstating the evidence and in drawing unsupported conclusions based upon the evidence.  While we do not find that the later claim has merit, we do recognize that the court incorrectly stated that the police arrived in "two to three marked vehicles" when in fact the evidence showed that all but one of the vehicles were unmarked.  We do not see that this minor misstatement by the court in its order undermines the reasoning supporting the ultimate decision to suppress the evidence obtained by the police.  Our review of the circuit court's ultimate ruling on the motion to suppress is 
de novo
.  Review under this standard has allowed us to thoroughly examine the entire record before us.  Based on this examination, we conclude that the circuit court's grant of the defendant's motion was supported by the manifest weight of the evidence.   III. CONCLUSION

For the foregoing reasons, the order of the circuit court granting the defendant's motion to suppress all the statements and physical evidence obtained by police in their September 6, 2001, encounter is affirmed. 

Affirmed.

GOLDENHERSH and KUEHN, JJ., concur.

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 09/11/03.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.