THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JAMES V. CROFT, Defendant-Appellee.

Second District   No. 2—02—0889

Opinion filed March 9, 2004.

Glen R. Weber, State's Attorney, of Galena (Martin P. Moltz and Gregory L. Slovacek, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

G. Joseph Weller and Mark G. Levine, both of State Appellate Defender's Office, of Elgin, for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, James V. Croft, was charged with the unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2002)), a Class 4 felony. Defendant filed a motion to quash his arrest and suppress the evidence, asserting that it was obtained through an illegal seizure. The trial court granted defendant's motion, and the State timely appealed. We affirm.

The facts are undisputed. On July 15, 2002, Officer Anthony Row was on patrol, in uniform, in a marked squad car. Accompanying Row was his friend, Brad Gardner, a police officer from Iowa who was neither in uniform nor acting in an official capacity. At 11:15 p.m., Officer Row observed defendant pushing his bicycle up a hill in a residential neighborhood. Defendant, wearing dark pants and no shirt, walked his bicycle because it did not have a light. Officer Row passed defendant in his squad car, turned around, and parked in the street. He then exited the vehicle and waited for defendant to approach. Although the red lights were not activated, the car was partially obstructing traffic. When defendant was within speaking distance, Officer Row identified himself, informed defendant of several complaints of theft and vandalism in the area, and asked for identification. Defendant was not carrying tangible identification, but provided his name and date of birth. Defendant felt that it was his duty to comply with the officer's request.

After defendant identified himself, Officer Row asked where he was headed. According to Officer Row, there had been several thefts and vandalism in the area between July 10 and 15, 2002, and it "just seemed strange" seeing defendant push a bicycle while in dark pants at 11:15 p.m. Defendant replied that he was going to see his girlfriend, Tina Fowler, and that he had been working on the roof of her parents' home. Officer Row, who had moved into the neighborhood in February 2002, "knew that she lived in that area" and that work was being done on the roof. However, Officer Row did not recognize defendant and had not seen him in the area before. Officer Row testified that he "was stopping [defendant] to make sure that there was [*sic*] nothing else going to happen."

Officer Row radioed the sheriff's department for defendant's criminal history and any outstanding warrants. While Officer Row was waiting for this information, Officer Hefel arrived in another squad car and parked on the other side of the street. According to Officer Row, when an officer effects a stop "of any kind," another officer automatically deploys to that area. During this time, Officer Row commented on defendant's tattoo. The tattoo, located on defendant's back, was a picture of Anamosa State Penitentiary. Officer Row had previously worked at that prison and stated that it was "a very nice tattoo." Officer Row testified that he initially saw the tattoo when his car's headlights illuminated defendant's bare back, although the tattoo was not the reason he initiated contact with defendant.

After waiting approximately 5 to 10 minutes, Officer Row was informed that defendant had no outstanding warrants. Officer Row did receive an "officer safety alert" due to defendant's previous convic-

tions of assault, theft, and possession of drugs. According to Officer Row, "whenever a criminal history comes back with drugs," the dispatcher relays an officer safety alert, or "10-61," which is code for "isolate yourself." Officer Row then turned off his portable radio and remained outside with defendant, while Officer Hefel closed his car door and received information from the sheriff's department.

Next, Officer Row asked defendant for consent to do a pat-down search of his person to ensure that he did not have any weapons or burglary tools. Defendant agreed, turned around, and raised his arms. A pat-down of defendant's pockets and socks revealed neither weapons nor burglary tools. Officer Row then noticed that defendant was carrying a tan, transparent shopping bag, which was open at the top. Defendant testified that the transparent bag was hanging from his bike's handlebars and contained a white paper bag. Officer Row asked defendant what was in the white paper bag, and defendant replied that it contained dirty socks. Officer Hefel asked defendant if he could search the bag. According to defendant, he said "yeah" and began removing it from his handlebars. Defendant testified that Officer Hefel then reached over, grabbed the bag, and started looking through it. Defendant agreed to the search because he felt that he "had to," and because he did not feel that he could walk away. Defendant was subsequently arrested for unlawful possession of a substance containing methamphetamine (720 ILCS 570/402(c) (West 2002)).

In its ruling on the motion to quash arrest and suppress evidence, the trial court made the following findings. Based on the four previous thefts in the neighborhood, the initial encounter between Officer Row and defendant qualified as a community caretaking encounter. Defendant explained where he was headed, and this explanation was consistent with Officer Row's observation that people, in fact, had been working on the Fowlers' roof. However, the community caretaking function ceased at the point where defendant explained his conduct and the check on his information revealed no warrants. In addition, the court found that the officer safety alert did not create a basis for a *Terry* stop, because there was nothing to indicate that a crime had been or was about to be committed. The court determined that, even if the officer safety alert provided some basis for a pat-down, the issue was "not really relevant" since the pat-down failed to reveal any weapons. According to the court, "the encounter should have ended" at that point. However, defendant did not feel free to leave, due to the continued questioning and the presence of two squad cars. Because defendant was illegally detained, his subsequent consent to the search was tainted. Accordingly, the court granted defendant's motion to quash his arrest and suppress evidence.

The State argues that the court erred by granting defendant's motion to quash his arrest and suppress evidence. The State does not dispute the trial court's finding that the initial contact was proper on a community caretaking basis. Instead, the State contends that the circumstances were sufficient to transform the encounter into a *Terry* stop (see *Terry v. Ohio*, 392 U.S. 1, 22, 20 L. Ed. 2d 889, 906-07, 88 S. Ct. 1868, 1880 (1968)), and that the search of defendant's bag was reasonable. Defendant counters that the initial encounter was an investigative stop rather than a function of community caretaking, and that Officer Row did not have a reasonable, articulable suspicion that defendant had committed or was about to commit a crime.

■ When the facts are not in dispute, as in this case, our review of a trial court's determination on a motion to suppress evidence is *de novo*. *People v. Avant*, 331 Ill. App. 3d 144, 149 (2001).

■ Theoretically, there are three tiers of lawful police-citizen encounters: (1) an arrest supported by probable cause; (2) a *Terry* stop or brief seizure of a person that must be supported by a reasonable and articulable suspicion of criminal activity; and (3) an encounter commonly referred to as the community caretaking or public safety function, which involves no coercion or detention and thus does not constitute a "seizure." *People v. Leifker*, 307 Ill. App. 3d 25, 28 (1999). Community caretaking is a label that describes consensual police-citizen encounters that typically involve the safety of the public. *People v. Harris*, 207 Ill. 2d 515, 522 (2003). An encounter is a function of community caretaking when an officer initiates it to check on an individual's well-being, without initial thought of criminal activity. *People v. Simac*, 321 Ill. App. 3d 1001, 1004 (2001). This function is totally divorced from the detection, investigation, or acquisition of evidence of a violation of a criminal statute. *City of Highland Park v. Lee*, 291 Ill. App. 3d 48, 52 (1997).

In the present case, we are not convinced that Officer Row's initial contact with defendant fell within the community caretaking function. Rather, Officer Row's testimony revealed that the purpose behind the encounter was investigative. Four thefts and two incidents of vandalism were reported the week before the encounter. According to Officer Row, seeing defendant push a bicycle while in dark pants at 11:15 p.m. "just seemed strange" and was "not a normal occurrence in that neighborhood." Officer Row subsequently initiated the encounter "to make sure that there was [*sic*] nothing else going to happen."

When an officer questions an individual to check on his well-being, without initial thought of criminal activity, he is within the purview of community caretaking. However, Officer Row did not question defendant without initial suspicion of criminal activity. On the

contrary, he questioned defendant to investigate his possible involvement in recent instances of theft and vandalism in the neighborhood. See *People v. Dent*, 343 Ill. App. 3d 567, 578 (2003) (police are not performing a community caretaking function when they are specifically investigating reports of criminal activity). Because Officer Row's purpose in questioning defendant was not totally divorced from detection, investigation, or acquisition of evidence, we cannot say that he was performing community caretaking.

The danger of blurring the distinction between community caretaking and an investigative detention becomes apparent when an officer claims to be engaging in community caretaking but is, in reality, investigating reports of criminal activity. For this reason, we decline to extend the label of community caretaking to the facts of this case. To hold otherwise would grant police officers the authority to, in fact, "investigate" criminal activity under the guise of community caretaking. Practically speaking, officers would be encouraged to originate contact under this pretense with the hope that the encounter would escalate into a valid *Terry* stop. In effect, this is an abuse of the community caretaking function. The requirement of reasonable suspicion under *Terry* is diluted if officers are permitted to "ease into" a *Terry* stop by first engaging in community caretaking.

■ That said, Officer Row's initial contact with defendant did not implicate the fourth amendment because consensual police questioning, even when it is investigative, does not constitute a seizure. See *People v. Smith*, 331 Ill. App. 3d 1049, 1052 (2002). A person is seized within the meaning of the fourth amendment when the police have in some way restrained that person's liberty. *Smith*, 331 Ill. App. 3d at 1053. The question is whether, in view of all the circumstances, a reasonable person would believe that he was free to leave. *Smith*, 331 Ill. App. 3d at 1053.

Here, the State argues that the encounter escalated into a *Terry* stop after Officer Row received the safety alert. Thus, the State does not dispute that defendant in this case was seized. Instead, the State argues that the stop was valid under *Terry*, citing the following factors as establishing reasonable suspicion: Officer Row's intimate knowledge of the community, the recent thefts and vandalism, defendant's dark dress and tattoo, Officer Row's failure to recognize defendant as one of the workers in the neighborhood, and the officer safety alert.

■ The fourth amendment offers protection by balancing the public interest in controlling crime and effective law enforcement with an individual's right to be free from unreasonable search and seizure. *Avant*, 331 Ill. App. 3d at 151. Thus, a limited investigatory or *Terry* stop is permissible only where there is a reasonable suspicion, based

upon specific and articulable facts, that the person has committed or is about to commit a crime. *People v. Robinson*, 322 Ill. App. 3d 169, 174 (2001). Determining whether the stop was an unreasonable seizure is a two-step process. *People v. Sparks*, 315 Ill. App. 3d 786, 792 (2000). First, we decide whether the stop was justified at its inception; next, we determine whether the scope of the stop was proportional to the circumstances that justified the interference in the first place. *Sparks*, 315 Ill. App. 3d at 792.

■ Whether the stop was justified at its inception is an objective consideration. *People v. Thomas*, 198 Ill. 2d 103, 109 (2001). We ask whether the police action was appropriate based on the facts available to the officer. *Thomas*, 198 Ill. 2d at 109. An officer's investigatory "good faith" is not sufficient to warrant the intrusion. *Sparks*, 315 Ill. App. 3d at 792. The officer must be able to point to specific and articulable facts which, taken together with reasonable inferences therefrom, reasonably warrant the intrusion. *Thomas*, 198 Ill. 2d at 109.

■ In addition, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. *Avant*, 331 Ill. App. 3d at 151. In deciding whether there was reasonable suspicion, we consider the totality of the circumstances. *Smith*, 331 Ill. App. 3d at 1055. While a reasonable suspicion may emerge from seemingly innocent, noncriminal conduct, the question for the court is the degree of suspicion that attaches to the circumstances surrounding a defendant's actions. *Smith*, 331 Ill. App. 3d at 1055. The facts are insufficient to support an investigatory detention when they describe " ' "a very large category of presumably innocent travelers, who would be subject to virtually random seizures." [Citation.]' " *Smith*, 331 Ill. App. 3d at 1055, quoting *People v. Anaya*, 279 Ill. App. 3d 940, 945-46 (1996).

■ Further, an officer's decision to engage in a brief *Terry* stop may not be justified on the basis of unparticularized suspicion or on a hunch. *People v. Gherna*, 203 Ill. 2d 165, 181 (2003). The situation confronting the officer must be so far from the ordinary that any competent officer would be expected to act quickly. *Avant*, 331 Ill. App. 3d at 152-53.

■ In this case, the facts known to Officer Row simply did not establish an articulable basis to believe that a crime had been, or was about to be, committed. A few days prior to his encounter with defendant, Officer Row was informed that there had been a few incidents of theft and vandalism in that particular neighborhood. However, Officer Row had not personally responded to any of those complaints and had no description of a possible suspect. No evidence suggested that he observed defendant doing anything but walking his

bicycle. In fact, nothing about defendant's activity suggested criminal conduct. At most, Officer Row commented that defendant walking a bicycle at 11:15 p.m. "just seemed strange" and was "not a normal occurrence in that neighborhood." Officer Row further stated that he had not seen defendant in the area before. However, stopping an individual because he looks "suspicious" or is new to the area, without more, is insufficient to establish reasonable suspicion. See *Brown v. Texas*, 443 U.S. 47, 49-52, 61 L. Ed. 2d 357, 360-63, 99 S. Ct. 2637, 2639-41 (1979). Further, defendant had no outstanding warrants and provided an explanation for his conduct. Defendant's reason for being in the neighborhood was consistent with Officer Row's knowledge that work was being done in the area. In short, Officer Row had merely a hunch, not the reasonable suspicion necessary to effect a *Terry* stop.

Additionally, our supreme court has held that an officer lacked reasonable suspicion to conduct an investigatory stop in a closer case than the one at bar. In *Thomas*, an individual was spotted riding his bicycle at 11:30 p.m. while holding a police scanner that permitted him to monitor police radio transmissions. *Thomas*, 198 Ill. 2d at 106. The officer had previously arrested the individual for drug offenses, had recently learned of his release from prison, and had heard a confidential informant's tip that the individual was using his bicycle to deliver illegal drugs. *Thomas*, 198 Ill. 2d at 106. Nevertheless, the court held that the officer's suspicion was grounded in circumstances that fell short of warranting a stop. *Thomas*, 198 Ill. 2d at 110.

In the present case, it is clear that Officer Row effected the investigatory stop without having the requisite degree of suspicion to support it. Having concluded that Officer Row lacked reasonable suspicion to stop defendant, we need not address whether the officers exceeded the scope of a proper *Terry* stop. Because defendant's consent to search was tainted as the product of the illegal detention, the trial court did not err in determining that the evidence against him must be suppressed.

For the foregoing reasons, we affirm the judgment of the circuit court of Jo Daviess County.

Affirmed.

McLAREN and GILLERAN JOHNSON, JJ., concur.