THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. MAURICE L. PAYNE, Defendant-Appellee.

Second District   No. 2—07—0065

Opinion filed July 6, 2009.

John A. Barsanti, State's Attorney, of St. Charles (Lawrence M. Bauer, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Alexander Vroustouris, of Chicago, for the People.

Thomas A. Lilien and Jack Hildebrand, both of State Appellate Defender's Office, of Elgin, for appellee.

JUSTICE BOWMAN delivered the opinion of the court:
Defendant, Maurice L. Payne, was charged with one count of

unlawful possession of a controlled substance with the intent to deliver within 1,000 feet of a park, in violation of section 407(b)(1) of the Criminal Code of 1961 (Code) (720 ILCS 570/407(b)(1) (West 2006)), one count of unlawful possession of a controlled substance with the intent to deliver, in violation of section 401(c) of the Code (720 ILCS 570/401(c) (West 2006)), and one count of unlawful possession of a controlled substance, in violation of section 402(c) of the Code (720 ILCS 570/402(c) (West 2006)). On August 25, 2006, defendant moved to quash the arrest and suppress evidence, arguing that the police executed a *Terry* stop (see *Terry v. Ohio*, 392 U.S. 1, 22, 20 L. Ed. 2d 889, 906-07, 88 S. Ct. 1868, 1880 (1968)) without a reasonable suspicion of illegal activity. On December 1, 2006, the trial court granted defendant's motion to quash and suppress. The State moved for reconsideration, and the trial court denied that motion on December 15, 2006. On January 16, 2007, the State filed a certificate of impairment and timely appealed the trial court's order, pursuant to Supreme Court Rule 604(a)(1) (210 Ill. 2d R. 604(a)(1)). We reverse and remand.

We note that on May 13, 2008, defendant moved to dismiss the State's appeal, citing this court's holding in *People v. Marker*, 382 Ill. App. 3d 464, 477 (2008). We held in *Marker* that a motion by the State to reconsider an interlocutory order suppressing evidence would not toll the time for filing an appeal under Supreme Court Rules 604(a)(1) and 606(b) (210 Ill. 2d R. 606(b)). *Marker*, 382 Ill. App. 3d at 477. On May 21, 2008, on our own motion, we held this case in abeyance pending the supreme court's review of *Marker* and took defendant's motion with the case. The supreme court has since reversed the holding in *Marker*. See *People v. Marker*, 233 Ill. 2d 158 (2009). Accordingly, jurisdiction is proper in this case, and we deny defendant's motion to dismiss the appeal.

The following testimony was derived at the hearings on defendant's motion to quash and suppress, held on October 3 and October 18, 2006. Trooper Joseph Stavola had been employed with the Illinois State Police North Central Narcotics Task Force (Narcotics Task Force) since November 2004 and had been with the Illinois State Police since May 1997. With the Narcotics Task Force, Trooper Stavola worked with interdiction, search warrants, "buy busts," and *Terry* stops in drug-related cases. On March 8, 2005, he was investigating defendant after having received information from a confidential informant. The informant was to remain anonymous, but Trooper Stavola and Trooper Doster had used the informant on one other occasion. The informant told them that an individual by the name of "Reese" would arrive at 534 Manner Place in Aurora in a white sport

utility vehicle (SUV), with cocaine for sale. The informant stated that the SUV would arrive sometime around 7:47 p.m. on March 8. Reese was described as a black male.

Trooper Stavola and Trooper Doster spoke with the informant around 7:30 p.m. Trooper Stavola did not believe that the informant had any case pending or that he had been arrested recently. The day before, the informant had given Master Sergeant Steegle information that led to an arrest. Trooper Stavola worked on that case the day before, but he did not receive that information directly from the informant.

After receiving the present information from the informant, Trooper Stavola, along with Master Sergeant Steegle, Master Sergeant Melvin, Trooper Garcia, and Trooper Doster, set up surveillance of 534 Manner Place in Aurora. Master Sergeants Steegle and Melvin and Trooper Garcia were assigned to perform primary surveillance, while Trooper Stavola and Trooper Doster were to be the "approaches." As the "approaches," the troopers were to verify the information received from the informant, and if the information were verified, they would approach Reese and talk to him about the sale of narcotics.

Surveillance was set up near 7:45 p.m. Around 7:52 p.m., a white Dodge Durango pulled into the driveway of 534 Manner Place. Master Sergeant Steegle advised Trooper Stavola that a black male was driving the Durango and advised him of the registration on the car. Trooper Stavola performed a Secretary of State inquiry on the registration and learned that the Durango was registered to defendant at a Naperville address. Master Sergeant Melvin then relayed that he observed a male subject exit the residence and enter the Durango. The man sat in the car for a minute or two, then left, and eventually returned to the vehicle. Master Sergeant Steegle then received real-time information from the informant that the driver of the vehicle was defendant.[1] At that point, Trooper Stavola and Trooper Doster had reason to believe that "crime was afoot, that the driver of that SUV was there to conduct an illegal narcotic transaction," and they approached the Durango to conduct a *Terry* stop. Trooper Stavola explained that his belief was based on the informant's information and the police work that confirmed the details that the informant provided.

Trooper Doster approached the passenger side of the Durango, and Trooper Stavola approached the driver's side. Defendant became

---

[1]The record is unclear whether the informant was in the surveillance car with Master Sergeants Steegle and Melvin or in another vehicle or accessed by telephone.

startled, which was determined by his facial expression. Trooper Stavola saw defendant quickly move his left hand from near his body toward the floorboard of the car. Trooper Stavola had a flashlight in his left hand, which allowed him to see the movement. When he saw that furtive movement, Trooper Stavola opened the car door and grabbed defendant's hand. Defendant's hand was balled up, and Trooper Stavola told him to open his hand. Trooper Stavola knew from his training and experience that when a suspect makes furtive movements, he is trying to conceal or destroy evidence or hide some type of weapon. Defendant opened his hand and a baggy of cocaine fell out. Defendant was then arrested and advised of his rights.

Harry Gibson testified next. At the time of his testimony, Gibson was incarcerated, but he had previously resided at 534 Manner Place in Aurora. On the evening of March 8, defendant and Gibson were sitting in defendant's Durango, which was parked in Gibson's driveway. They had been friends for approximately six years. Gibson was in defendant's car for just a few seconds when the police came. On cross-examination, Gibson admitted that he had entered the Durango for a few seconds prior, left and gotten a cigarette from his friend who was in another vehicle in the driveway, then returned to the Durango. The other vehicle was parked in front of defendant's Durango and it was a white Ford Explorer. Gibson denied that he left the Durango to enter the residence. He was not paying attention to defendant before the police approached the vehicle, so he did not see what defendant was doing.

Defendant testified as follows. On March 8, 2006, around 7:40 p.m., defendant drove his white Dodge Durango to Gibson's home at 534 Manner Place. He and Gibson had been friends for approximately six years. Defendant pulled into the driveway and parked behind and to the left of a white Ford Explorer. The Explorer was there when defendant arrived. A man was inside the Explorer but defendant did not know the man's identity. Gibson walked to defendant's vehicle, then walked over to the Explorer, and then returned to defendant's vehicle. Gibson was in defendant's vehicle for a couple seconds before the police came and opened the doors and grabbed defendant. He did not recall whether the officers said anything to him. He did not see if they were in uniform because it was dark outside. Defendant was parked on private property and his car had tinted windows except for the driver's and front passenger's windows and the windshield. On cross-examination, defendant admitted that the officers told him to open up his hands. Defendant stated that he was just sitting in the vehicle with his hand on his lap. His hand was "not really" in a fist position when he was sitting there but it was when the officer opened the door to "snatch" him up.

On December 1, 2006, the trial court granted defendant's motion. In its ruling, the trial court stated that it needed to consider the informant's veracity, reliability, and basis of knowledge in order to determine whether the tip was sufficient to establish a reasonable articulable suspicion for a *Terry* stop. Because the informant had provided information the day before that led to an arrest, the informant had some reliability. An informant's veracity is bolstered if the police corroborate the information provided. However, the corroboration must relate to something more than innocent details, such as the color of a car. Here, the police corroborated the vehicle's color and type, the time of its arrival, and the identity of the driver, but these were all innocent details. No information was given regarding the basis of the informant's knowledge. Therefore, the trial court reasoned that while the police met the second prong (reliability), they did not establish a basis for the informant's knowledge to support the first prong of a *Terry* stop, and it granted defendant's motion.[2]

On December 15, 2006, the State moved for reconsideration. In its argument, the State sought to make a distinction between an anonymous tip and one from a confidential informant. The court acknowledged the difference but still believed that the information provided by the informant related to innocent details. Again, because the police did not state how the informant knew about these details, the trial court denied the State's motion. The State timely appealed, arguing that the trial court applied the wrong test for determining whether the *Terry* stop was proper. Specifically, the State argues that under the proper test, considering the totality of the circumstances, a deficiency in one factor may be compensated for by other factors. Here, despite the fact there was no showing for the informant's basis of knowledge, the remaining factors supported the *Terry* stop, including that details were corroborated independently by the troopers and that the informant provided accurate information the day before. Defendant argues that the trial court's ruling was correct because the informant provided only innocent details.

When reviewing a trial court's ruling on a motion to suppress, we apply a two-part standard of review: we review the trial court's find-

---

[2]Under *Terry*, the reasonableness of police action taken during an investigative detention involves a twofold inquiry: (1) whether the officer's action was justified at its inception; and (2) whether the officer's action was reasonably related in scope to the circumstances that justified the interference in the first place. *People v. Baldwin*, 388 Ill. App. 3d 1028, 1031-32 (2009). In this case, no issue related to the officer's conduct after the stop's inception was raised in the trial court or this court. Therefore, we address only whether the stop was justified at its inception.

ings of historical fact and reverse those findings only if they are against the manifest weight of the evidence, and we review *de novo* the trial court's ultimate legal ruling as to whether suppression was warranted. *People v. Cosby*, 231 Ill. 2d 262, 271 (2008). Here, there are no disputed facts and so we review *de novo* only the trial court's ultimate legal conclusion that suppression was warranted.

The fourth amendment protects an individual's right to be free from unreasonable searches and seizures while it balances the public interest in effective law enforcement and controlling crime. *People v. Croft*, 346 Ill. App. 3d 669, 674 (2004). Thus, a limited investigatory, or *Terry*, stop, is permissible only where there is a reasonable suspicion, based upon specific and articulable facts, that the person has committed or is about to commit a crime. *Croft*, 346 Ill. App. 3d at 674-75. Determining whether a stop was reasonable is a two-step process in which we decide (1) whether the stop was justified at its inception, and (2) whether the scope of the stop was proportional to the circumstances that justified the interference in the first place. *Croft*, 346 Ill. App. 3d at 675. Whether the stop was justified at its inception is an objective consideration where we ask whether the police action was appropriate based on the facts available to the officer. *Croft*, 346 Ill. App. 3d at 675. The officer must be able to point to specific, articulable facts that, taken with their reasonable inferences, warrant the intrusion. *Croft*, 346 Ill. App. 3d at 675. We consider commonsense judgments and inferences about human behavior when determining whether an officer's suspicion was reasonable. *Croft*, 346 Ill. App. 3d at 675. When determining whether there was a reasonable suspicion, we consider the totality of the circumstances. *Croft*, 346 Ill. App. 3d at 675.

While reasonable suspicion may develop from seemingly innocent, noncriminal conduct, the question for the court is the degree of suspicion that attaches to the circumstances surrounding a defendant's actions. *Croft*, 346 Ill. App. 3d at 675. Facts that describe a large category of presumably innocent travelers are insufficient to support an investigatory stop. *Croft*, 346 Ill. App. 3d at 675. When an officer's suspicion is based in part upon a confidential informant's tip, we, again, look at the totality of the circumstances to determine whether reasonable suspicion existed. See *Illinois v. Gates*, 462 U.S. 213, 230, 76 L. Ed. 2d 527, 543, 103 S. Ct. 2317, 2328 (1983). Factors such as the informant's veracity, reliability, and basis of knowledge, which were used in older, more restrictive analyses, are still useful in a totality-of-the-circumstances analysis. *Gates*, 462 U.S. at 230, 76 L. Ed. 2d at 543, 103 S. Ct. at 2328. However, the court is not to apply rigid rules when evaluating the weight to give an informant's tip because,

" 'like all other clues and evidence coming to a policeman on the scene,' " tips may vary greatly in their value and reliability. *Gates*, 462 U.S. at 232, 76 L. Ed. 2d at 544, 103 S. Ct. at 2329, quoting *Adams v. Williams*, 407 U.S. 143, 147, 32 L. Ed. 2d 612, 617, 92 S. Ct. 1921, 1924 (1972). "[A] deficiency in one [factor] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Gates*, 462 U.S. at 233, 76 L. Ed. 2d at 545, 103 S. Ct. at 2329. "If, for example, a particular informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip." *Gates*, 462 U.S. at 233, 76 L. Ed. 2d at 545, 103 S. Ct. at 2329.

In *Gates*, the Supreme Court made special mention of the fact that the Illinois Supreme Court was incorrect in finding that probable cause was not established because the police corroborated only innocent details that were contained in an anonymous tip. *Gates*, 462 U.S. at 243-44 n.13, 76 L. Ed. 2d at 552 n.13, 103 S. Ct. at 2335 n.13. The Supreme Court stated that seemingly innocent activity becomes suspicious in light of the tip and that probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. *Gates*, 462 U.S. at 243-44 n.13, 76 L. Ed. 2d at 552 n.13, 103 S. Ct. at 2335 n.13.

In *Gates*, the police received an anonymous letter, which stated:

" 'This letter is to inform you that you have a couple in your town who strictly make their living on selling drugs. They are Sue and Lance Gates, they live on Greenway, off Bloomingdale Rd. in the condominiums. Most of their buys are done in Florida. Sue his wife drives their car to Florida, where she leaves it to be loaded up with drugs, then Lance flys down and drives it back. Sue flys back after she drops the car off in Florida. May 3 she is driving down there again and Lance will be flying down in a few days to drive it back. At the time Lance drives the car back he has the trunk loaded with over $100,000.00 in drugs. Presently they have over $100,000.00 worth of drugs in their basement.

They brag about the fact they never have to work, and make their entire living on pushers.

I guarantee if you watch them carefully you will make a big catch. They are friends with some big drugs dealers, who visit their house often.' " *Gates*, 462 U.S. at 225, 76 L. Ed. 2d at 540, 103 S. Ct. at 2325.

Investigators confirmed that a driver's license had been issued to Lance Gates in Bloomingdale, and they contacted a confidential

informant to confirm a more recent address for the Gateses. *Gates*, 462 U.S. at 225, 76 L. Ed. 2d at 540, 103 S. Ct. at 2325. The police also confirmed that Lance had booked a flight to Florida for May 5, and they arranged surveillance for that flight. Authorities confirmed that Lance boarded the flight, exited the West Palm Beach airport, went to a nearby Holiday Inn room registered under his wife's name, and drove onto a highway used by travelers to the Chicago area. *Gates*, 462 U.S. at 226, 76 L. Ed. 2d at 540, 103 S. Ct. at 2326. Police confirmed that the car was registered to Lance, and police were granted a search warrant for the Gateses' home and car. *Gates*, 462 U.S. at 226, 76 L. Ed. 2d at 540, 103 S. Ct. at 2326. The Supreme Court applied a totality-of-the-circumstances test and determined that probable cause existed where the details in the anonymous letter were corroborated by police, where the anonymous letter indicated that the Gateses were involved in drug trafficking, and where the letter contained details about third parties' future actions that ordinarily are not easily predicted. *Gates*, 462 U.S. at 245-46, 76 L. Ed. 2d at 552, 103 S. Ct. at 2335-36.

In *Draper v. United States*, 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329 (1959), a case with which the *Gates* Court compared its facts, the Supreme Court found that the corroboration of "innocent details" was sufficient to establish probable cause. The paid informant in *Draper* had worked with federal agents for approximately six months, and the agents had found his information accurate and reliable. The informant told the agents that Draper lived in Denver and was selling drugs, that he had gone to Chicago by train, and that he would have three ounces of heroin when he returned to Denver by train on the morning of September 8 or September 9. *Draper*, 358 U.S. at 309, 3 L. Ed. 2d at 329-30, 79 S. Ct. at 331. Further, the informant described the clothing that Draper would be wearing, said that he would be carrying a tan zipper bag, and said that he walked really fast. *Draper*, 358 U.S. at 309, 3 L. Ed. 2d at 330, 79 S. Ct. at 331. On September 9, police spotted a man fitting the description at the Denver train station, and the police stopped and arrested him. The police found two envelopes of heroin in his pocket and a syringe in his tan zipper bag. *Draper*, 358 U.S. at 310, 3 L. Ed. 2d at 330, 79 S. Ct. at 331. The Supreme Court held that the police had probable cause to arrest, because the officer in the Denver train station had first verified every piece of information that the informant provided except for the detail regarding the narcotics. *Draper*, 358 U.S. at 313, 3 L. Ed. 2d at 332, 79 S. Ct. at 333. The Supreme Court explained, "with every other bit of [the informant's] information being thus personally verified, [the officer] had 'reasonable grounds' to believe that the remaining unverified bit of

[the informant's] information—that [the defendant] would have the heroin with him—was likewise true." *Draper*, 358 U.S. at 313, 3 L. Ed. 2d at 332, 79 S. Ct. at 333.

Here, we are considering reasonable suspicion, which is a lesser burden than probable cause. In *Alabama v. White*, 496 U.S. 325, 110 L. Ed. 2d 301, 110 S. Ct. 2412 (1990), the Supreme Court addressed the lower standard necessary to justify a *Terry* stop in light of an anonymous tip. In *White*, an anonymous phone call provided police with information that the defendant would leave a certain apartment complex at a particular time in a brown station wagon with a right taillight lens broken, that she would drive to a certain motel, and that she would possess an ounce of cocaine in a brown attache case. *White*, 496 U.S. at 327, 110 L. Ed. 2d at 307, 110 S. Ct. at 2414. Officers saw the brown vehicle leave the apartment complex at the stated time and followed the car just short of the motel. They stopped the vehicle and informed the defendant that she was suspected of possessing cocaine in the vehicle, and she agreed to let them search the vehicle. The brown attache case was in the vehicle and the defendant provided the police with the combination to its lock. Officers found marijuana in the case and arrested the defendant. Later, the officers discovered cocaine in the defendant's purse. *White*, 496 U.S. at 327, 110 L. Ed. 2d at 307, 110 S. Ct. at 2414-15.

The Supreme Court considered the issue of whether the officers had a reasonable suspicion to stop the defendant's vehicle based on the anonymous tip. It noted that the level of suspicion necessary to justify a *Terry* stop was obviously less than for probable cause and that a reasonable suspicion, thus, could arise from information that is less reliable than that required to show probable cause. *White*, 496 U.S. at 329-30, 110 L. Ed. 2d at 308-09, 110 S. Ct. at 2416. The *White* Court then compared its facts to the facts in *Gates* and concluded similarly that the officers had sufficiently corroborated the details provided by the tipster and that the details demonstrated that the tipster had some inside information or familiarity with the defendant's activities, because he had predicted future conduct of a third party. *White*, 496 U.S. at 332, 110 L. Ed. 2d at 310, 110 S. Ct. at 2417. Thus, it concluded that the totality of the circumstances, including the details provided by the tipster and the corroboration obtained by the officers, sufficiently established that the police had a reasonable suspicion to stop the defendant's car. *White*, 496 U.S. at 332, 110 L. Ed. 2d at 310, 110 S. Ct. at 2417; see also *Village of Mundelein v. Thompson*, 341 Ill. App. 3d 842, 850-52 (2003) (finding anonymous tip plus officer's cor-

roboration of potential drunk driver was sufficient to establish reasonable suspicion for *Terry* stop).

■ In this case, the trial court considered of great importance the fact that no basis for the informant's knowledge was established and that the information that the police corroborated pertained to innocent details. The details that police corroborated included the color and type of the vehicle, the time the vehicle was to arrive at the stated address, the race and gender of the driver, and the name of the driver as "Reese." While defendant argues that the informant had the driver's name incorrect because the police determined that the car was registered to "Maurice Payne," we note that "Reese" could be an abbreviated version of "Maurice." We also note that Trooper Stavola testified that Master Sergeant Steegle had confirmed in real time with the informant that the driver's name was Maurice Payne. Beyond the independent corroboration of the informant's information, Trooper Stavola also observed Gibson proceed from the house to defendant's vehicle, return to the home for a short time, and then return to defendant's vehicle. When Troopers Stavola and Doster walked toward the vehicle, Trooper Stavola saw defendant become startled and make a furtive movement. Given the informant's information and the activity with Gibson around defendant's vehicle, the police had reasonable suspicion and could conclude that the informant was correct in the only uncorroborated detail, that defendant had narcotics for sale.

We find that the trial court erred when it placed significant weight on the fact that some of the informant's details pertained to innocent ones and that the basis of the informant's knowledge was unknown. While some of the facts the informant provided pertained to innocent details, such details, when taken in context with the informant's information and the police corroboration, became suspicious, as pointed out by the Supreme Court in *Gates, Draper*, and *White*. The facts of this case are even stronger than the facts in *White* because in this case, the police knew the informant's identity and knew that he had provided them with reliable information the day before. Further, the facts of this case are remarkably similar to the facts in both *Gates* and *Draper*, in which the stricter probable cause standard was necessary in order to defeat the defendants' motions to suppress. Certainly, considering the totality of the circumstances and the lower level of suspicion necessary to perform a *Terry* stop, the State sufficiently established that the officers had a reasonable suspicion to make the initial investigatory stop.

Based on the foregoing reasons, we reverse the judgment of the circuit court of Kane County and remand for further proceedings consistent with this opinion.

Reversed and remanded.

ZENOFF, P.J., and McLAREN, J., concur.